**LEEDS & NORTHRUP COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent,

**Leeds and Northrup Employees Union,**
Intervenor.

No. 16459.

United States Court of Appeals
Third Circuit.

Argued Sept. 12, 1967.

Decided March 20, 1968.

Robert M. Landis, Dechert, Price & Rhoads, Philadelphia, Pa. (Galen J. White, Jr., Philadelphia, Pa., on the brief), for petitioner.

Lawrence M. Joseph, N. L. R. B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, John E. Nevins, Attorney, N. L. R. B., on the brief), for respondent.

W. Glenn George, Philadelphia, Pa., for intervenor.

## OPINION OF THE COURT

Before KALODNER, FREEDMAN and SEITZ, Circuit Judges.

FREEDMAN, Circuit Judge.

We have before us an employer's petition for review and the Board's cross-petition for enforcement of the Board's order declaring that the employer has violated §§ 8(a) (1) and 8(a) (5) of the National Labor Relations Act.[1]

In 1922 the employer, Leeds & Northrup Company, established an extra compensation plan. It originally included only the members of its executive committee and later was expanded to cover other managerial employees. In 1937 the company established a Supplementary Compensation Plan for the benefit of all its other employees, including the members of Leeds & Northrup Employees Union, which filed the present charge.

The Supplementary Compensation Plan was never made part of any written contract, although from 1941 to 1964 twenty-one separate collective bargaining agreements were entered into between the company and the union. It is undisputed that in the fall of each year the board of directors of the company made its independent determination to continue, for the current fiscal year ending May 31, the Plan and the formula under which profits were allocated among stockholders and various groups of employees. This practice continued without controversy until 1965, when the present dispute arose. Once, in 1958, the company announced a unilateral change in the formula because of criticism by stock analysts after the company had gone public. Proposals for elimination of the Plan were made on one occasion by the union and later by the company, but were ultimately withdrawn. The union's proposal, made in 1955 during the course of negotiations for a collective bargaining agreement, was that all existing bonus plans be eliminated and a new single plan be substituted with a fixed percentage of distribution across the board to all company employees. The company rejected the proposal and the union eventually withdrew it. Nine years later, in the course of their 1964 contract negotiations, the company proposed to the union the elimination of the Plan in exchange for other employee fringe benefits. The union rejected the proposal. The company's president then addressed a letter to all the employees informing them that the Plan would be continued, and within a few days, on November 9, 1964, a new collective bargaining agreement was signed to run until October 12, 1967. It was while this agreement was in effect that the present controversy arose.

In April, 1965, the company's board of directors adopted a new formula for the fiscal year ending May 31, 1966, which was announced following a board meeting in September, 1965. The only change made was to reduce the employees' share of company profits in excess of a level which it had attained only twice in its history. The company admits that it did not notify the union or consult with it prior to the promulgation of the new formula in September. When the union's officials protested the change in formula the company refused to enter into any negotiations regarding it.

The Board found that the company's unilateral act in altering the formula for

1. The Board's decision and the intermediate report of the trial examiner appear in 162 N.L.R.B. No. 87 (1967).

the fiscal year ending May 31, 1966, was a violation of §§ 8(a) (1) and 8(a) (5) which make it an unfair labor practice for an employer to interfere with the rights of its employees by refusing to bargain collectively with their representatives.[2]

 The National Labor Relations Act, § 8(d), specifies that the requirement of collective bargaining imposes "the mutual obligation * * * to * * confer in good faith with respect to wages, hours, and other terms and conditions of employment * * *." The principle at the heart of the statutory provision is that basic terms which are vital to the employees' economic interest, such as wages, may not be altered unilaterally by the employer without bargaining with the representative whom the employees have authorized to act on their behalf and whom the law makes their exclusive agent. It has therefore been held that an employer may not make a change in wages without affording the union an opportunity to bargain over the change, either during the running of a current agreement,[3] or while the parties are in the midst of negotiating a new agreement.[4] The Act not only protects the employees from the direct economic effect of the employer's unilateral action, but also forbids the bypassing of the collective bargaining agent, for this would undermine the union's authority by disregarding its status as the representative of the employees. Even an increase in wages unilaterally granted by an employer who has bypassed the collective bargaining representative is for this reason a violation of the Act.[5]

 It is true that the parties may by express contract confer on the employer the power of unilateral decision.[6] The union would have no basis for complaint in such a case, since § 8(d) expressly provides that neither party is required "to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract". Such a contractual provision might even deal with wages, as well as the other basic elements specified in the Act.[7] In such a case the employer's right to act unilaterally would be founded upon the bargain the parties had made. Here, however, the parties did not by contract confer such unilateral authority on the company. The provision in the collective bargaining agreement that the "Company retains the responsibility and authority of managing

---

2. Section 8(a) provides:
"It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by section 157 of this title [section 7 of the Act];
* * * * *
"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title [section 9 (a) of the Act]." 28 U.S.C. §§ 158(a) (1), (5).

3. NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); NLRB v. Niles-Bement-Pond Co., 199 F.2d 713 (2 Cir. 1952); General Telephone Co. of Florida v. NLRB, 337 F. 2d 452 (5 Cir. 1964); NLRB v. Tom Johnson, Inc., 378 F.2d 342 (9 Cir. 1967). Similar cases and their varying views appear in Annot., Discontinuance of Previous Employee Benefits not Covered in Collective Bargaining Agreement as Unfair Labor Practice, 45 A.L.R.2d 689 (1956), and its supplements.

4. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); Industrial Union of Marine and Shipbuilding Workers v. NLRB, 320 F.2d 615 (3 Cir. 1963), cert. denied, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964); see Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). See also Annot., supra n. 3.

5. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).

6. See NLRB v. C & C Plywood Corp., 385 U.S. 421, 425, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); General Controls Co., 88 N.L.R.B. 1341, 1342 (1950).

7. See NLRB v. C & C Plywood Corp., supra, 385 U.S. 425, 430, 87 S.Ct. 559.

the Company's business" falls far short of such power. Resort therefore must be had to implication from the union's conduct to determine whether it agreed to repose this unilateral authority in the company.[8]

The company's main argument is directed to this issue. It urges that the relationship between the parties must be governed by their customary practice, or the "common law of the shop", which supplemented their formal contract.[9] This mutually developed "common law", it asserts, includes the right of the company each year to decide how profits should be allocated among its employees. In proof of this it points to the absence of any requirement regarding the formula in any of the twenty-one collective bargaining agreements which the parties had already negotiated and the undoubted practice of annual determination by the board of directors of the company in the fall of each year for the current fiscal year. It urges that this is supported by the uncontradicted evidence that each year a posted bulletin announced the decision to continue the Plan as "instituted in 1937 and revised from time to time", and that the handbook which was distributed to all employees stated that "it is necessary, because of many varying circumstances, to make the Supplementary Compensation Plan effective for one year periods only." It notes, in addition, the unilateral change in the formula announced in 1958, without union objection.

The Board found, however, that there was no understanding or custom by which the company could unilaterally alter the formula fixing the proportion of profits to the union employees. On the contrary, it found as a fact that in the 1964 negotiations the union had reduced

its wage demands and executed a three year contract with no provision for a wage reopener partly because the company withdrew its suggestion that the Plan should be eliminated and instead notified the employees by letter that the Plan would be continued.

The Board articulated its finding that there was no implied agreement that alteration of the formula was a management prerogative in terms of its doctrine of waiver, under which it holds that a union must clearly and unmistakably waive its right to bargain on a matter which is a mandatory subject of bargaining before the employer has the right to make a unilateral change.[10] Both this doctrine and the so-called "common law of the shop" are, on analysis, merely alternative formulations of the principle that the parties may implicitly agree that a particular subject shall be left to the unilateral decision of the employer. Whether such an implied agreement existed is a factual question, and we may not therefore overturn the Board's finding if it is supported by substantial evidence.[11] The union, faced with the company's practice over the years, might well have remained quiescent until such time as it was seriously dissatisfied with the formula. The Board therefore was not bound to find the existence of an implied agreement that the formula might be altered by the company without affording the union an opportunity to bargain.

The company claims that there is an inconsistency between the Board's present conclusion and the view it has taken in cases where an employer unilaterally subcontracts work during the term of a collective bargaining agreement. The Board has held that there was no violation of § 8(a) (5) where the employer

8. See Speidel Corp., 120 N.L.R.B. 733 (1958).

9. See United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 579–582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

10. Beacon Piece Dying & Finishing Co., Inc., 121 N.L.R.B. 953 (1958); The Press Co., Inc., 121 N.L.R.B. 976 (1958); New Orleans Board of Trade, Ltd., 152 N.L.R.B. 1258 (1965).

11. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

had unilaterally engaged in the practice of subcontracting for a substantial period of time and the union employees had never performed the work which was subcontracted.[12] These decisions, however, are distinguishable from the present case, for in them the employer maintained the status quo, and the Board in refusing to find an unfair labor practice acted in harmony with its general view that the absence of prior discussion with the union where the status quo is maintained does not constitute a refusal to bargain.[13] Here, however, the status quo was represented by the formula, and it is the formula which the company unilaterally altered. The effect of the change is not neutralized because the employees might still receive the same dollar amount from the Plan as they received in preceding years, for the essence of the formula is to tie the benefits received to the fluctuating elements of profits, not to provide a fixed sum. In any event, the various elements which existed in the subcontracting cases constitute the ingredients from which the Board could more readily than here have felt impelled to conclude that an implied agreement existed to leave the issue to management's prerogative. Those decisions do not establish a rule of law whose application to the present case would undermine as erroneous the Board's finding that here no implied agreement existed which conferred on the company the right of unilateral alteration of the formula without even bargaining with the union.

Finally, the company strongly objects to the remedial portion of the Board's order which requires the company to grant back pay to the union employees for the fiscal year 1966 on the basis of the old formula, which it reinstates pending bargaining on any change. Since the company admittedly acted in good faith and did not violate § 8(a) (3) [14] it challenges the Board's order as arbitrary and improper and attacks it on the ground that it provides the employees with a benefit which they did not obtain in the process of collective bargaining.

The argument, however, encounters the heavy obstacle that the Board is the agency entrusted with the task of devising the remedies which are appropriate to effectuate the policies of the Act.[15] The Supreme Court has made it clear that the Board's order may not be overturned "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." [16] The Court reiterated this view in Fibreboard Paper Products Corp. v. NLRB, supra, where it upheld the Board's order of reinstatement with back pay to remedy the employer's § 8(a) (5) violation in unilaterally subcontracting

12. E. g., Westinghouse Electric Corp. (Mansfield Plant), 150 N.L.R.B. 1574 (1965); American Oil Company, 151 N.L.R.B. 421 (1965); Superior Coach Corp., 151 N.L.R.B. 188 (1963); American Oil Company, 152 N.L.R.B. 56 (1965); Westinghouse Electric Corp., Bettis Atomic Power Laboratory, 153 N.L.R.B. 443 (1965).

13. E. g. Bishop, McCormick & Bishop, 102 N.L.R.B. 1101 (1953); Instrument Division, Rockwell Register Corp., 142 N.L.R.B. 634, 642 (1963). See also NLRB v. Katz, 369 U.S. 736, 746, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. Frontier Homes Corp., 371 F.2d 974, 980 (8 Cir. 1967).

14. Section 8(a) (3) provides:
"It shall be an unfair labor practice for an employer—
* * * * *
"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *." 29 U.S.C. § 158(a) (3).

15. Section 10(c), 29 U.S.C. § 160(c); NLRB v. Seven-Up Bottling Co. of Miami, Inc., 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); International Union of Electrical, Radio & Machine Workers, etc. v. NLRB, 328 F.2d 723, 727 (3 Cir. 1964).

16. Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943).

work previously performed by union employees. In Fibreboard the employer did not violate § 8(a) (3) and good faith was as pervasive as it is here.[17] The Board's back pay award in this case is supportable on the ground that the union might have successfully resisted all or a portion of the reduction in its share of profits had it been afforded an opportunity to bargain, and the employees should not be left in a worse position than they might have enjoyed if the union had been given the opportunity to bargain. While it is true that a retroactive order might afford the employees a better position than the union's bargaining might have achieved, the Board can hardly be said to be effectuating policies beyond the purposes of the Act by resolving the doubt against the party who violated the Act. Retroactive enforcement must always contain in it some element of hardship on the employer, but a failure to grant back pay imposes at least an equal hardship on the employees. In the *Fibreboard* case the Supreme Court upheld the Board's back pay order in spite of the fact that it resulted in the employer's being required to pay its employees for the same work for which it had already paid the subcontractor. While undue hardship may be taken into account as an element in deciding whether to award back pay, there was here no showing of such hardship before the Board. Nor is there any undue prejudice to purchasers of the company's stock after the change in the formula, since shareholders always purchase stock subject to the risk of litigation which may be brought against the corporation. Here, moreover, the prospectus on which the new issue of stock was sold contained a notice of the unfair labor practice charge which resulted in the present order.

We are led, therefore, to the conclusion that regardless of the view we might have taken if we were charged with the duty of dealing in the first instance with the scope and extent of the remedy, the Board's order requiring payment to the employees under the old formula for the fiscal year ending May 31, 1966, and reinstating the old formula pending bargaining on the subject is one which was within its authority and discretion.[18]

The order of the Board will be enforced.

---

17. We have held an employer's good faith to be irrelevant to the propriety of a back pay order, albeit to remedy a discriminatory discharge under § 8(a) (3). International Union of Electrical, Radio & Machine Workers, etc. v. NLRB, supra, 328 F.2d at 727.

18. General Telephone Co. of Florida v. NLRB, 337 F.2d 452, 454-455 (5 Cir. 1964), which refused to enforce an order of the Board requiring the back payment of Christmas checks which were unilaterally terminated although there was a violation of §§ 8(a) (1) and 8(a) (5) of the Act, was decided shortly before the Fibreboard case, and contains no reasoning to justify its conclusion. We therefore do not find it persuasive. .