**BASTIAN–BLESSING, DIVISION OF GOLCONDA CORPORATION,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 72–1456.

United States Court of Appeals, Sixth Circuit.

Feb. 21, 1973.

Paul F. Gleeson, Chicago, Ill., Arthur B. Smith, Jr., Van H. Viot, Chicago, Ill., on brief; Vedder, Price, Kaufman & Kammholz, Chicago, Ill., of counsel, for petitioner-appellant.

Allison W. Brown, Jr., N.L.R.B., Marcel Mallet-Prevost, Asst. General Counsel, Steven C. Kahn, Atty., N.L.R.B., Washington, D. C., Jerome H. Brooks, Director, Region 7, N.L.R.B., Detroit, Mich., on brief, for respondent-appellee.

Before EDWARDS and CELE-BREZZE, Circuit Judges, and HASTIE,* Senior Circuit Judge.

EDWARDS, Circuit Judge.

Bastian-Blessing petitions to set aside and the Board seeks enforcement of an order of the National Labor Relations Board finding the employer guilty of 8(a)(5) and 8(a)(1) violations of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1) (1970), by unilaterally terminating an employee health insurance plan which had previously been in force through insurance with Aetna Life Insurance Company.

The employer, purporting to maintain the same benefits, undertook self-insurance. Subsequent to the termination of the Aetna coverage, it informed the union[1] as to what it had done and discussed the reasons for the change, but declined to go back to the Aetna insurance contract when requested to do so.

The Board found that the Aetna termination materially affected mandatory subjects of bargaining in relation to health insurance in that two material changes were made in benefits under the company self-insurance program and in that, in addition, the enforceability, administration and funding of the plan were affected. The Board's order required Bastian-Blessing to restore the status quo by reinstating the contract with Aetna.

The Board Decision and Order of December 16, 1971, is reported at 194 N.L.R.B. 95 (1971), and its Supplemental Decision of March 30, 1972, is reported at 195 N.L.R.B. 167 (1972).

The material facts of this case do not appear to this court to be in dispute. Petitioner does dispute the inferences which the Trial Examiner and the Board drew from those facts, along with the legal conclusions drawn therefrom. Specifically, Bastian-Blessing claims that after termination of the Aetna insurance contract, it engaged in good faith negotiations with the union concerning its health insurance program, which served to satisfy the bargaining obligation under the Act. It also claims that the Board was without authority to order it to reinstate the insurance contract between it and Aetna Life, since it claims that the identity of the insurance carrier is not a mandatory subject for bargaining.

Petitioner, Bastian-Blessing, is a division of a conglomerate, Golconda Corporation, which merged with Astro Controls, Inc., the previous parent corporation of Bastian-Blessing, while this controversy was going on. Local 893 of the Brotherhood of Carpenters has been bargaining agent since 1953 only for 165 employees of the Bastian-Blessing Division. Aetna Life Insurance Company had been the Bastian-Blessing group insurance carrier since World War II. It issued a group insurance policy containing the benefits negotiated between Local 893 and Bastian-Blessing in 1959. This policy was continued in effect, with some changes resulting from collective bargaining, up until August 1, 1970, when the company canceled the contract unilaterally, without prior notice to the union.

The group health insurance plan was a contributory plan. Each employee

---

* Honorable William H. Hastie, Senior Judge, U. S. Court of Appeals for the Third Circuit sitting by designation.

[1]. Local 893, United Brotherhood of Carpenters & Joiners of America, AFL–CIO.

paid $1.00 per week toward its cost and the employee contributions represented approximately 40% of the premium cost, with the employer paying the rest.

The Trial Examiner found a relationship between increasing benefit costs and the sudden termination of the Aetna contract:

In the fiscal year ending April 20, 1967 (as reported on Form D–2 to the Department of Labor), the total premiums paid Aetna (for over 1,500 employees) amounted to $395,318. Aetna paid out benefits, and put in reserves, a total of $312,696, and refunded over $56,000 to the Company. By fiscal 1969, with somewhat fewer employees, the total premiums had increased almost $100,000, to $493,372, and the total benefit charges had *increased* over $229,000 (*73 percent*) to $541,852. Instead of a cash rebate as in 1967, there was a deficit in 1969 of $92,883. (The 1969 Form D–2 shows that Aetna retained $30,053 for expenses, as compared to fiscal 1968 expenses of $28,765—an increase of less than $1,500. In fiscal 1967, which included a period of time when the Company's own employees were processing claims for Aetna, the Aetna expenses were $15,559. The amount of commissions decreased from $3,756 in 1967 to $2,625 in 1969, whereas taxes increased from $6,776 to $11,725.)

Despite the increased costs, the Union negotiated further health benefits in its new 3-year collective-bargaining agreement, effective from December 1, 1969, through November 30, 1972. Nothing was said in the negotiations about canceling the Aetna policy or changing carriers. * * * Thus, I find that although the reference to the old Aetna employee booklet was deleted, the Company and the Union still bargained for a continuation of the Aetna plan. (Following these 1969 negotiations, the Company contracted with Aetna to amend Group Policy GC–40,636 to provide the increased benefits.)

The Trial Examiner and the Board found also that when Bastian-Blessing instituted its self-insurance plan as described in its "Company Insurance Certificate," it omitted entirely two significant employee benefits: a conversion privilege without evidence of insurability, and the certainty of coverage of new-born babies under the $20,000 major medical benefit.

The Board further found that Bastain-Blessing's cancellation of the Aetna contract deprived its employees of enforceability of the prior master contract and of Aetna's administration of that contract:

In the negotiations for the current 1969-1972 collective-bargaining agreement, as previously found, the Company and the Union bargained for a continuation of the Aetna plan, with various increased benefits which the Company thereupon contracted with Aetna to provide. Under this union-negotiated plan, not only was the payment of the employees' health benefits ensured in writing by the 56-page Aetna Group Policy GC–40,636 (the master contract), but also the interpretation and application of the group policy was placed in the hands of the well-known group insurance carrier, Aetna.

The Company's unilateral and irrevocable August 1 cancellation of the Aetna group policy, and the January 7 issuance of its "Company Insurance Certificate," deprived the employees of both the protection of the enforceable master contract, and (as discussed later) Aetna's interpretation and application of it.

The January 7 "Certificate" did not contain all the pertinent provisions governing the payment of benefits. It was a modified copy of the most recent Aetna "Group Insurance Certificate" (employee booklet), and was thus only a "summary of the essential features" of the previous Aetna insurance coverage. It failed to set out such provisions in the Aetna master contract as (a) what employees are el-

igible (permitting coverage of full-time employees working temporarily on a part-time basis), (b) eligibility after 3 months of continuous service, (c) requirement of written request, etc., for coverage of dependents, (d) effective date for dependent's coverage if application is made within 31 days, and if made thereafter, (e) the specific amount of nonoccupational disability weekly benefit ($52, as set out in bargaining agreement), (f) method of computing "average weekly earnings" for determining 70 percent limitation on weekly benefit, (g) exclusions and limitations applied in the event a family member is disabled when the maximum benefit is increased, (h) no benefits if prohibited in jurisdiction of residence, and (i) employer shall not "discriminate unfairly between individuals in similar situations" in administration of the provisions.

In many places where the January 7 Certificate is copied from the Aetna employee booklet, the Company has substituted the words, "the Plan," for the words, "the group policy." For example, on the cover page of the Certificate, the sentence from the Aetna employee booklet containing the words, "certain terms of the Group Policy," was changed to read, "The kinds of coverage and *certain terms of the Plan* applicable thereto are described on this and the following pages of this Certificate." (Emphasis supplied.) In other places in the Certificate, there still remain repeated references to "the group policy." Thus former references in the Aetna "employee [booklet"] *sic* to "the group policy" now appear in the January 7 Certificate in such phrases as: "subject to the terms of the Plan," "payable under the Plan," "subject to the terms of the group policy," "if included in the Plan," "benefits provided under the Plan," "coverage under the Plan," "subject to the limits provided in the Plan," "Employee's insurance under the group policy," and

"coverage under the group policy." These references in the Certificate to "the Plan" and "the group policy" are evidently made (as were the references in the Aetna employee booklet) to the detailed provisions in the now-canceled Aetna Group Policy GC–40,636. Therefore the Certificate issued on January 7 is not a self-contained document setting out all the provisions of the self-insured health program. Furthermore, there appears not to be in existence any such document, which would be enforceable as the Aetna group policy was.

Finally, the Board noted that Bastian-Blessing's witnesses left unanswered questions concerning funding of the self-insurance program. The Board considered this uncertainty over funding an adverse impact on the employees' previously-negotiated benefits.

## HOLDING

■ We believe that the history of collective bargaining between these parties, including the negotiations which resulted in the level of benefits under the insurance plan which was in effect prior to August 1, 1970, indicates clearly that there was substantial evidence on this record taken as a whole to support the finding of the Board as described in its Supplemental Decision of March 30, 1972:

In our Decision and Order herein, we found that the Aetna insurance plan for active employees was a provision of the contract between the Union and Respondent, and we therefore held that Respondent's mid-term unilateral change to a self-insured plan for its active employees was a violation of Section 8(a)(5). Benefits for retired employees were not involved.

■ Health insurance benefits clearly represent mandatory subjects for bargaining. NLRB v. Scam Instrument Corp., 394 F.2d 884 (7th Cir. 1968); McLean v. NLRB, 333 F.2d 84 (6th Cir. 1964); Inland Steel Co. v. N.L.R.B., 170 F.2d 247 (7th Cir.), cert. denied,

336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1948).

Where, as here, these benefits have been determined by an existing collective bargaining agreement, a unilateral change violates the express language of both Section 8(d) and Section 8(a)(5).

We believe the controlling case on this issue is NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), wherein the Supreme Court said:

> The duty "to bargain collectively" enjoined by § 8(a)(5) is defined by § 8(d) as the duty to "meet . . . and confer in good faith with respect to wages, hours, and other terms and conditions of employment." Clearly, the duty thus defined may be violated without a general failure of subjective good faith; for there is no occasion to consider the issue of good faith if a party has refused even to negotiate *in fact*—"to meet . . . and confer" —about any of the mandatory subjects. A refusal to negotiate *in fact* as to any subject which is within § 8(d), and about which the union seeks to negotiate, violates § 8(a)(5) though the employer has every desire to reach agreement with the union upon an over-all collective agreement and earnestly and in all good faith bargains to that end. We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal.

> \* \* \* Unilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to the congressional policy. It will often disclose an unwillingness to agree with the union. It will rarely be justified by any reason of substance. It follows that the Board may hold such unilateral action

to be an unfair labor practice in violation of § 8(a)(5), without also finding the employer guilty of over-all subjective bad faith. NLRB v. Katz, *supra* at 742–743, 747, 82 S.Ct. at 1111, 1114. (Footnotes omitted.)

In McLean v. N.L.R.B., 333 F.2d 84 (6th Cir. 1964), this court relied upon the *Katz* case in upholding a finding of a Section 8(a)(5) violation by an employer's unilateral change of a health insurance plan:

> In our opinion, Katz compels a finding of an § 8(a)(5) violation here. Blue Cross insurance was an alternative plan, as opposed to the union's health insurance plan, which should have been negotiated with it. This is part of the statutory duty to bargain collectively. McLean v. NLRB, *supra* at 87.

■■ We do not think that Bastian-Blessing's meetings with the union after it had, without notice, effected the unilateral changes described above served to excuse its violations of its duty to bargain. This record contains substantial evidence to support the Trial Examiner and the Board's rejection of the petitioner's good faith argument based on subsequent bargaining and over-all conduct. In addition, there is clearly no union acquiescence in or failure to protest the unilaterally wrought changes here as is found in the cases relied upon by petitioner. Cf. Georgia Pacific Corporation, 150 N.L.R.B. 885 (1965); Hartman Luggage Co, 145 N.L.R.B. 1572 (1964); NLRB v. Cone Mills Corp., 373 F.2d 595 (4th Cir. 1967).

To this court, however, the most difficult question pertains to the explicit order of the Board to reinstate "the Aetna Life Insurance Company group health insurance which was terminated August 1, 1970." Both parties seem to interpret this order as requiring not just the identical contract with its identical benefits, administration, and funding, but the identical company as well. We have found, however, no case law which squarely supports the proposition that

the specific insurance carrier for a group health plan is a mandatory subject for bargaining. This identical issue was the subject of a motion for rehearing of the instant case before the NLRB after the Supreme Court decided Allied Chemical Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). The Board analyzed petitioner's argument relying on *Chemical Workers* as follows:

> In *Pittsburgh Plate Glass,* the Supreme Court held that retired employees are not "employees" within the meaning of the Act, and are not included in the "bargaining unit," and therefore that the employee group health insurance plan negotiated by the Company and the Union was only a permissive and not a mandatory subject for bargaining with respect to the Company's retired employees. For these reasons, the Court concluded that the Company's unilateral mid-term modification " . . . of a permissive term such as retirees' benefits . . ." did not violate the Act. On the other hand, the Court affirmed well established prior holdings of the Board and the Courts that " . . . mandatory subjects of collective bargaining include pension and insurance benefits for active employees, and an employer's mid-term unilateral modification of such benefits constitutes an unfair labor practice."

In our Decision and Order herein, we found that the Aetna insurance plan for active employees was a provision of the contract between the Union and Respondent, and we therefore held that Respondent's mid-term unilateral change to a self-insured plan for its active employees was a viola-tion of Section 8(a)(5). Benefits for retired employees were not involved.

It may be that, as respondent attempts to demonstrate by analogy, benefit levels are in some circumstances severable from their source of "brand name." We need not decide that broad question here. In our previous decision in this case, we found that Respondent's change from Aetna involved a substantive loss, at least in terms of Aetna's administration and funding. Thus, under the facts of this case, the identity of the carrier was a mandatory subject of bargaining, and the benefit to be restored is a single "ball of wax"—the preexisting Aetna plan. (Footnote omitted.)

■ We have sought to find a way to separate the carrier from the benefits in this case, and we have failed. The peculiar terms of the bargaining contract here obviously incorporate by reference or necessary implication important sections of the Aetna contract. The history of this bargaining relationship shows that bargaining on health insurance historically was related to the Aetna contract. The employees, by terms of the labor-management contract, were made major contributors to the costs of the Aetna contract. Under these facts, the Board's remedy that the benefits be restored by restoring "the preexisting Aetna plan" as a single "ball of wax" appears justified.

■ We emphasize that the conclusion reached herein is governed by the facts of this case and is not to be interpreted as a ruling by this Court that the naming of an insurance carrier for an employee group benefit plan, in the absence of other considerations, is a mandatory subject for bargaining.

Enforcement is granted.