**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NORTHEAST OKLAHOMA CITY MANUFACTURING COMPANY, Respondent.**

**No. 79–1152.**

United States Court of Appeals, Tenth Circuit.

Argued May 7, 1980.

Decided Sept. 8, 1980.

James Callear, Washington, D. C. (William F. Wachter of N. L. R. B., Washington, D. C., with him on the brief), for petitioner.

Peter T. Van Dyke, Lytle Soule & Emery, Oklahoma City, Okl., for respondent.

Before BARRETT and SEYMOUR, Circuit Judges, and PECK, Senior Circuit Judge.*

JOHN W. PECK, Senior Circuit Judge.

This case is before the Court on application of the National Labor Relations Board (the Board), brought under Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 *et seq.* (the Act) for enforcement of its July 6, 1978, Order

* Of the United States Court of Appeals, Sixth Circuit, sitting by designation.

against Northeast Oklahoma City Manufacturing Company (the Company).[1] The issues to be decided are: (1) whether the Board properly refused to defer this case to arbitration, (2) whether substantial evidence on the record supports the Board's finding that payment of employee bonuses after the middle of the month constituted an unlawful unilateral change in working conditions, in violation of Section 8(a)(5) of the Act, and a material breach of the collective bargaining agreement, (3) whether the late payments excused the employees' resort to strike action, notwithstanding the contract's grievance–arbitration and no–strike provisions, rendering the Company's discharge of the strikers a violation of Section 8(a)(3) and (1) of the Act, and (4) whether the Board properly imposed backpay liability from the date of discharge of the strikers rather than from 5 days after the strikers made an unconditional offer to return to work. For the reasons appearing hereinafter, we resolve all of the above issues in favor of the Board, and grant enforcement of its order.

I

This case arises from the respondent's February 5, 1975, discharge of 12 employees who took part in a walkout on that date to protest the Company's delay in paying monthly bonuses. The respondent, which was engaged in the manufacture of electrical hardware, employed 18 production and maintenance employees at its plant. Since 1972, the employees have been represented by the International Brotherhood of Electrical Workers, Local 2021 (the Union). The Company and the Union were parties to a collective bargaining agreement that was effective from November 13, 1972, until November 12, 1975.

In addition to an hourly wage, the contract provided that,

> the Company will pay monthly, a bonus to all qualified employees based upon the following formula: Five per cent (5%) of production attributable to labor minus the cost of labor. . . . In order to qualify an employee must have a minimum of two (2) months service; must work a minimum of Eighty Percent (80%) of the hours available for work; must be present as of the end of the month for which the bonus is paid; and must meet minimum expected output and quality requirements set by supervisors. . . .

The testimony credited by the administrative law judge showed that, in practice, Plant Manager Ralph Stevenson generally permitted employees to receive a bonus on the basis of their attendance alone, without regard to the efficiency and quality of their work. The Board also found, and the Company concedes, that it was the respondent's practice to pay the bonus in the second week of the month following the month in which it was earned. This practice began prior to the time the employees were represented by the Union, and continued after the collective bargaining agreement was entered into, though the exact time for payment was not specified therein.

Trouble began when the Company failed to pay the July '74 bonus in mid–August. Following that, bonuses were paid after the middle of the month in five of the next six months. Bonuses for August and September were not received until the second month following the month in which they were earned. And December's bonus had not yet been paid as of February 5, 1975, when the workers walked out of the plant.

Prior to the walkout, the evidence shows that the employees and the Union attempted to resolve the dispute through their contractual grievance machinery. The collective bargaining agreement established an informal grievance procedure for presenting complaints to and discussing them with successively higher levels of management. Typically, when bonus payments were not forthcoming by the middle of the month,

---

1. The Board's Supplemental Decision and Order is reported at 236 NLRB No. 167 (1978). The Board's earlier order remanding the case to the administrative law judge for a decision on the merits in lieu of abstaining from exercising its jurisdiction and deferring to the parties' arbitration machinery is reported at 230 NLRB 135 (1977).

the employees would complain to the employee–stewards at the plant, the stewards would present a grievance to their plant supervisor, Nesbitt, and to plant manager Stevenson, and the Union's chief steward, Hill, would meet with Stevenson and/or President James to discuss the matter. Just as typical was the Company's response. Nesbitt would assert that he had nothing to do with bonus payments, Stevenson would promise that payment would be made by a certain date, and the promise would be broken.

The proverbial straw that broke the camel's back was the untimeliness of December's bonus payment. Manager Stevenson promised Hill, in October of 1974, that the December bonus would be paid the first week of January. When the appointed time arrived, Steward Jackson contacted Stevenson to remind him of his promise. Stevenson replied that he did not know anything about it and that the employees would probably receive the bonus the following week. The first week of January passed without payment, and the employees began to protest to their stewards. Chief Steward Hill met with Manager Stevenson who said that "he was tired of fooling with it" and told Hill to speak with President James. James told Hill that the employees had earned a December bonus, but that the Company did not have any money. He referred Hill back to Stevenson. Stevenson promised Hill that the bonus would be paid on January 13. It was not paid on that date. When approached again, Stevenson promised that the employees would receive their bonus in the last week of January, but that promise too was broken. Finally, on Monday, February 3, Stevenson told Steward Jackson that the Company would pay the bonus that Friday.

On Wednesday of that week, Stevenson stated that the bonus would not be paid on Friday. Steward Jackson sought to speak with President James, but he refused to see her that week. Jackson relayed this information to the employees. The employees discussed the delay and decided to walk out to protest the Company's paying the bonus late so often. Without informing the Union of their intended action, 12 of the 18 employees clocked out and left the plant.

That afternoon, President James sent letters to the 12 employees who had left the plant, informing them that they were discharged for walking out and striking in violation of the no–strike clause in the contract. The contract then in effect provided that:

> The purpose of the Agreement is to provide orderly collective bargaining arrangements between the Company and the Union and to secure a prompt and fair disposition of all disagreements. The Union agrees that there will be no strikes, slowdowns or walkouts and that there will be no interruption of work or interference with the efficient operation of Company business or instigation of a boycott or lockout on the part of the Company during the term of this agreement.

Based on the foregoing facts, the Board concluded, reversing the administrative law judge, that it would not defer the case to arbitration and remanded the case to her for a decision on the merits of the case. On the merits, the Board concluded, affirming the administrative law judge, that the repeated, substantial delays in paying the bonus over a six month period, without notice to the Union and with a demonstrated unwillingness to resolve the matter through the collective–bargaining process, amounted to a unilateral change in working conditions in violation of Sections 8(a)(5) and (1) of the Act. The Board further found that when the employees walked out in protest over the late payments, they had the status of unfair labor practice strikers, and that they could not lawfully be discharged pursuant to the "no–strike" clause in the contract because the unfair labor practices were "serious" in nature. Accordingly, the Board found that the Company violated Sections 8(a)(3) and (1) of the Act when it discharged the employees for exercising their statutory right to strike. Alternatively, the Board concluded that the employees were not bound to observe the "no–strike" clause

because the respondent's repeated failure to honor its contractual obligation to pay the monthly bonus in timely fashion constituted a material breach of the contract, releasing the employees from the contractual prohibition against strikes. The Board therefore found that the Company's discharge of the 12 employees violated Section 8(a)(3) and (1) for this additional reason.

The Board's order requires the Company to cease and desist from the unfair labor practices found and from interfering in any other manner with its employees' rights under Section 7 of the Act. Affirmatively, the Board has ordered the respondent to bargain with the Union, resume paying the monthly bonus before or during the second week of the month, and offer the discharged strikers reinstatement with backpay running from the date of their discharge.

## II

The first issue to be addressed is whether the Board erred in refusing to defer this case to the parties' arbitration machinery. The collective bargaining agreement between the Union and the Company provided for binding arbitration in the event a grievance could not be settled. Neither party to this dispute sought arbitration prior to the filing of the complaint in this case, but the Company has since then declared its willingness to arbitrate. The Company argues that the Board's refusal to direct deferral constitutes an abuse of discretion in view of its own precedent. We disagree.

■ We have repeatedly held that parties to a collective bargaining agreement that provides for arbitration must resort to that mechanism to resolve their contract disputes prior to bringing a direct action in federal court to enforce their contract. *See Oil, Chem. & Atomic Wkrs. Intern. U. v. Am. Oil Co.*, 528 F.2d 252 (10th Cir. 1976); *Carpenters Dist. Coun. of Denver and Vic. v. Brady Corp.*, 513 F.2d 1 (10th Cir. 1975); *Johnson Builders, Inc. v. United Bro. of C. & J., Loc. U. No. 1095*, 422 F.2d 137 (10th Cir. 1970); *Brotherhood of L. F. & E. v. Kennecott Copper Corp. (Utah C. Div.)*, 338 F.2d 224 (10th Cir. 1964). Where, however, the jurisdiction of the Board is invoked to adjudicate unfair labor practice allegations that purportedly stem from violations of the collective bargaining agreement, the Board's jurisdiction to proceed is unaffected by the existence of an arbitration clause in the parties' contract. *See N.L.R.B. v. Strong*, 393 U.S. 357, 360–61, 89 S.Ct. 541, 544–545, 21 L.Ed.2d 546 (1969); *Carey v. Westinghouse*, 375 U.S. 261, 271, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964). Section 10(a) of the Act provides that the Board's power to prevent unfair labor practices "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law or otherwise." Accordingly, the Supreme Court has ruled that: "[t]he Board may proscribe conduct which is an unfair labor practice even though it is also a breach of a contract remediable as such by arbitration . . . . It may also, if necessary to adjudicate an unfair labor practice, interpret and give effect to the terms of a collective bargaining agreement." *N.L.R.B. v. Strong, supra*, 393 U.S. at 361, 89 S.Ct. at 544 (citations omitted).

In recognition of the value of arbitration in the maintenance of industrial peace, the Board has refrained from exercising its jurisdiction in many cases. Indeed, the Board has "wide discretion to 'decline to exercise its authority if to do so will serve the fundamental aims of the Act.'" *Lodges 700, 743, 1746, International Ass'n of Machinists and Aerospace Workers v. N.L.R.B.*, 525 F.2d 237 (2d Cir. 1975). *See also William E. Arnold Co. v. Carpenters Dist. Council of Jacksonville and Vicinity*, 417 U.S. 12, 16 & 18, 94 S.Ct. 2069, 2072 & 2073, 40 L.Ed.2d 620 (1974); *Associated Press v. N.L.R.B.*, 492 F.2d 662, 666 (D.C.Cir.1974); *cf. N.L.R.B. v. Auburn Rubber Co.*, 384 F.2d 1 (10th Cir. 1967).

■ The Board's discretion to defer or not defer is not unlimited. Once the Board has exercised its discretionary authority to establish a deferral policy, its original discretion is displaced. The Board must thereafter follow the policy it has adopted "un-

less and until it explicitly changes that policy." *N.L.R.B. v. Pincus Bros., Inc.–Maxwell*, 620 F.2d 367, 380 (3d Cir. 1980) (Garth, J., concurring). See also *N.L.R.B. v. Auburn Rubber Co., supra* at 3. Cf. *Midwest Stock Exchange v. N.L.R.B.*, 620 F.2d 629, 632–633 (7th Cir. 1980).

No clear guidelines emerged from the Board's deferral decisions in cases in which no arbitration award had issued prior to 1971. See, e. g., *McDonnell Aircraft Corp.*, 109 NLRB 930 (1954); and *Bemis Brothers' Bag Co.*, 142 NLRB 1311 (1963). In that year, however, a majority of the Board announced that, henceforth, the Board would abstain from exercising its power in those cases in which "a set of facts . . . present not only an alleged violation of the Act but also an alleged breach of the collective bargaining agreement subject to arbitration." *Collyer Insulated Wire*, 192 NLRB 837, 841 (1971). *Collyer* involved a Section 8(a)(5) failure to bargain allegation. In deferring to the parties' arbitration machinery, the Board noted that the resolution of the dispute would turn upon an interpretation of the substantive provisions of the contract, a function eminently suited to arbitration. The following year, the Board extended its deferral policy to encompass a case in which it was alleged that an employee had been discriminatorily discharged, in violation of Section 8(a)(3). *National Radio Co., Inc.*, 198 NLRB 527 (1972).

Between 1972 and 1977, the Board routinely applied the *Collyer* doctrine of deferral in 8(a)(3) cases, see, e. g., *United States Postal Service*, 210 NLRB 560 (1974); *Jemco, Inc.*, 203 NLRB 305 (1973), with the approval of the courts. See, e. g., *Lodges 700, 743, 746, International Ass'n of Machinists and Aerospace Workers v. N.L.R.B., supra*. In 1977, however, the composition of the Board changed, and with it, the Board's deferral policy. The alteration in Board policy was announced in two companion cases, *General American Transportation Corp.*, 228 NLRB 808 (1977), and *Roy Robinson Chevrolet*, 228 NLRB 828 (1977). The former case involved an allegation of a Section 8(a)(3) violation, the latter, a violation of Section 8(a)(5). In both cases, two of the five Board members voted to defer to the parties' arbitration mechanism, and two members voted to accept jurisdiction. The swing vote was cast by then Chairman Murphy, the new member of the Board. In *General American*, she joined members Fanning and Jenkins in holding that deferral was inappropriate where a Section 8(a)(3) violation was alleged. In *Roy Robinson Chevrolet*, however, she joined the *General American* dissenters, members Penello and Walter, in dismissing the Section 8(a)(5) complaint and deferring to arbitration.

Explaining why she came to the opposite conclusion in these two cases, Murphy wrote that a Section 8(a)(3) complaint entails an allegation that an employee's individual Section 7 rights have been violated. The resolution of such a dispute requires an interpretation of the Act, a function specifically committed to the Board's expertise, in addition to an interpretation of the contract. The underlying issue in 8(a)(5) complaints, on the other hand, is whether the employer has violated the bargaining agreement. The resolution of this issue depends solely upon an interpretation of the contract, and is "eminently suited to the arbitral process." *General American, supra* at 810.

The present case was remanded to the administrative law judge for consideration of the merits in light of the *General American* decision. In rather opaque language, the Board stated:

> Whether or not the Respondent's changes in the payment of bonuses and its conceded delinquencies in such payments violate Section 8(a)(5) is an issue involving not only the "private" contractual rights of the Respondent and Union, but also the quite separate rights of employees to engage in conduct ostensibly coming within the protection of Section 7 of the Act.[2]

When read in conjunction with *General American*, the Board's refusal to defer ap-

---

**2.** See footnote 1, *supra.*

pears to have been premised on its conviction that this was not a case in which "the resolution of the contract by an arbitrator [would] . . . dispose of the unfair labor practice issue." *Id.* at 810–811. If so, the decision not to defer when both a Section 8(a)(5) and a Section 8(a)(3) violation are alleged in the complaint is a logical extension of the *General American/Roy Robinson* deferral policy. The following analysis of the Act illustrates why arbitration would not necessarily dispose of the Section 8(a)(3) allegation in the present case.

■ Section 8(a)(3) of the Act prohibits an employer from discharging an employee for engaging in activity protected by Section 7 of the Act. *See N.L.R.B. v. International Van Lines*, 409 U.S. 48, 52–53, 93 S.Ct. 74, 77–78, 34 L.Ed.2d 201 (1972). Section 7 guarantees employees the right to engage in concerted activity, including the right to strike. Employees may waive their right to strike by agreeing to a no–strike clause in their collective bargaining contract, *Mastro Plastics Corp. v. N.L.R.B.*, 350 U.S. 270, 280, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956), thus rendering such activity unprotected and subjecting them to discharge for engaging therein. No waiver will be found, however, where the strike is in protest of employer unfair labor practices, *Mastro Plastics, supra*, which are "serious" in nature, *Arlan's Department Store*, 133 NLRB 802 (1961), or where the employer has materially breached a fundamental contractual obligation to its employees, *see, e. g., San Juan Lumber Co.*, 154 NLRB 1153 (1965), *aff'd on other grounds*, 367 F.2d 397 (9th Cir. 1966), unless the language of the no–strike provision explicitly waives the right to strike in protest thereof.

■ Section 8(a)(5) of the Act imposes a duty to bargain collectively, defined by Section 8(d) as the duty to "meet . . . and confer in good faith with respect to wages, hours, and other terms and condi-

tions of employment." Violation of this section is an unfair labor practice. A unilateral mid–term modification of any term contained in the contract violates the express language of Section 8(d).[3] *See Bastian–Blessing, Div. of Golconda Corp. v. N.L.R.B.*, 474 F.2d 49, 53 (6th Cir. 1973). Likewise, even where an existing term or condition of employment is not expressly governed by the collective bargaining agreement, an employer's unilateral change in such a term or condition is unlawful, unless the contract explicitly authorized the employer to make such a change, *see N.L. R.B. v. C&C Plywood Corp.*, 385 U.S. 421, 425, 87 S.Ct. 559, 562, 17 L.Ed.2d 486 (1967); *Office and Professional Emp. Int. U. Local 425 v. N.L.R.B.*, 419 F.2d 314 (D.C. Cir. 1969), or the union expressly waived its bargaining rights. *Leeds & Northrup Co. v. N.L.R.B.*, 391 F.2d 874 (3rd Cir. 1968).

■ In the instant case, an interpretation of the contract could have lead to three results: The contract could have been construed to impliedly control the specific time of payment, or to authorize payment at any time during the month, or not to control, expressly or impliedly, when payment was to be made. Only if an arbitrator had construed the contract to permit payment at any time would the interpretation have disposed of the Section 8(a)(3) issue, for then there would have been neither a material breach of the contract nor a unilateral change in a condition of employment. Any other interpretation would have required the Board to determine whether Section 8(a)(3) had been violated by the Company's discharge of its employees under the principles set forth above. Whether a Section 8(a)(5) violation, if found, rises to the level of a "serious" unfair labor practice, for example, requires an interpretation of the Act, not of the contract. Such a determination is within the exclusive province of the Board, not of an arbitrator.

---

**3.** Section 8(d), 29 U.S.C. § 158(d), provides, in pertinent part: "That where there is in effect a collective–bargaining contract . . ., the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless [specified conditions are met]." These conditions were not met in this case.

We find no abuse of discretion in the Board's refusal to defer in these circumstances.

## III

Turning to the merits of the case, we find respondent's arguments with respect thereto equally unpersuasive. The Board found that, prior to August 1971, it was respondent's policy to pay bonuses during the second week of the month following the month in which they were earned. Accordingly, it further found that the delays in payments from August of 1974 through February, 1975, constituted a unilateral change in a term or condition of employment. Applying the principles set forth in part II of this opinion, the Board held that the Company's mid–term changes violated Section 8(a)(5), and that this was a "serious" unfair labor practice that justified a walkout despite the contract's general no–strike clause.

Respondent does not challenge the Board's finding; in fact it concedes that it was the Company's long established practice to pay bonuses during the second week of the month. It contends, however, that there is no evidence that payments were "contractually due" at that time.

"Where past practice has established a meaning for language that is used by the parties in a new agreement, the language will be presumed to have the meaning given it by such past practice." *Pekar v. Local 181, International Union of United Brewery, etc.*, 311 F.2d 628, 636 (6th Cir. 1962), *cert. denied*, 373 U.S. 912, 83 S.Ct. 1303, 10 L.Ed.2d 414 (1963). Company President James's uncredited testimony to the effect that he did not understand the contract to require payment at any particular time notwithstanding, the Board was fully justified in relying on respondent's past practice in interpreting the contract to require that bonus payments be paid during the second week of the month.

The Company further argues that it fulfilled its duty to bargain by meeting with the Union representatives and its employees on the numerous occasions when it was approached concerning the late bonus payments. We cannot agree.

In *N.L.R.B. v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the Supreme Court stated that "[u]nilateral action by an employer without *prior* discussion with the union [amounts] to a refusal to negotiate. . . ." *Id.* at 747, 82 S.Ct. at 1114 (emphasis added). In answer to an argument similar to the one raised here, the Sixth Circuit said:

We do not think that [the Company's] meetings with the union after it had, without notice, effected the unilateral changes described above served to excuse its violations of its duty to bargain. This record contains substantial evidence to support the . . . Board's rejection of the [Company's] good faith argument based on subsequent bargaining and over–all conduct. In addition, there is clearly no union acquiescence in or failure to protest the unilaterally wrought changes . . . .

*Bastian–Blessing, supra,* 474 F.2d at 53. We believe that court's analysis applies with particular force to the case at bar.

The Company next argues that, even if it violated Section 8(a)(5), its conduct did not amount to a "serious" unfair labor practice, that would excuse a strike in contravention of the contractual no–strike clause. *See Arlan's Department Store*, 133 NLRB 802 (1962). There was no serious violation here, respondent contends, because all bonuses were eventually paid, and they constituted only a small portion of the employees' wages.

In *Arlan's*, the Board held that the discharge of an employee stemming from a "clash in personalities" did not immunize the unfair labor strike that ensued from the general contractual provision forbidding strikes. In holding that the discharge was not a "serious" unfair labor practice "'destructive of the foundation on which collective bargaining must rest,'", quoting *Mastro Plastics, supra*, 350 U.S. at 281, 76 S.Ct. at 357, the Board said:

The test we would apply is the test the Board has to apply in most of its cases—experience, good sense, and good judgment. . . . In this field, lines between the licit and illicit can rarely be drawn clearly in advance. And in the penumbral areas which are omnipresent, there is no substitute for niceties of judgment.

133 NLRB at 807.

■ The Board must be permitted to utilize the expertise it has acquired through experience in determining whether an unfair labor practice is "serious." We will not substitute our judgment for that of the Board's, unless it is clearly shown that the Board has acted arbitrarily or capriciously.

■ We conclude that the Board properly found that the Company's unilateral delays in making bonus payments, without bargaining, amounted to a serious unfair labor practice under the *Arlan's* rationale. Unlike the situation presented in *Arlan's*, the Company's unilateral action here affected most of its hourly employees, not just one. Moreover, repeated failure to pay bonuses when due aggravated the seriousness of the Company's offense. Respondent's attempt to deny the significance of these bonuses is unpersuasive. To these workers, some of whom made only $1.87 an hour, the bonuses of as much as $56 were a substantial portion of their monthly wage. Finally, the seriousness of the Company's violation cannot be measured only in terms of the economic consequences to its employees, for its conduct also disparaged the collective bargaining process itself. As the Supreme Court pointed out in *N.L.R.B. v. C&C Plywood Corp., supra*, there is "real injury . . . to the union's status as bargaining representative" when the employer acts unilaterally. 385 U.S. at 429, n. 15, 87 S.Ct. at 564.

Alternatively, the Board found that respondent's persistent delays in making bonus payments constituted a material breach of the collective bargaining agreement, excusing the employees from their obligation under the no–strike provision. *See Kellstone, Inc.,* 206 NLRB 156 (1973), *aff'd,* 493

F.2d 1352 (6th Cir. 1974); *United Electrical, Radio & Machine Workers, Local 1113 v. N.L.R.B.,* 223 F.2d 338 (D.C. Cir. 1955), *cert. denied,* 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956); *San Juan Lumber Company,* 154 NLRB 1153 (1965), *aff'd on other grounds,* 367 F.2d 397 (9th Cir. 1966).

The Board found, in *San Juan Lumber,* that:

[T]he [employer's repeated] failure to issue paychecks covered by sufficient funds was a material breach of the [employer's] basic and fundamental obligation to pay agreed–upon wages when due, of a character sufficient to excuse the employees' resort to strike action in disregard of the contractual grievance and no strike provisions.

154 NLRB at 1155.

■ Respondent has sought in its brief to distinguish *San Juan Lumber* from the case at bar on several points. We conclude, however, that the essential facts upon which the *San Juan Lumber* decision turned are fundamentally indistinguishable from the case at bar, and that the Board, therefore, properly found a material breach excusing performance here.

## IV

The final issue before us is whether the Board properly imposed backpay liability from the date of the strikers' discharge rather than 5 days after the strikers made an unconditional offer to return to work. The Board rejected the administrative law judge's recommendation that the latter remedy be imposed. It found that the strike was abandoned after the employees were discharged and that the discharged employees, through the Union, had made a request for reinstatement. Alternatively, the Board found that any request for reinstatement would have been futile. *See Valley Oil Co.,* 210 NLRB 370 (1974).

The Company sent out letters on February 5, 1975, the day of the walkout, notifying all employees who took part in the strike that their employment was terminated effective that date because of their par-

ticipation therein. On the following day, employee Jackson called the Company to ask about coming in to work. She was told there was no need to call, and that she should just come in to pick up her severance pay. Chief Steward Hill, of the Union, also called the respondent twice on February 6, to negotiate on getting the employees back to work. Though he reached foreman Nesbitt the first time, in neither case was he able to speak with Manager Stevenson or President James, both of whom it was claimed, were either busy or not at the plant. Hill's calls were never returned.

In the absence of any record evidence that the employees engaged in any strike activity beyond the February 5 walkout, the Board could properly find that Hill's efforts indicated an abandonment of the strike, and a request for reinstatement of the employees. Moreover, the Company's response to employee Jackson's request to come back to work, and its refusal to return Hill's calls amply support the Board's conclusion that any request for reinstatement would have been futile.

For the foregoing reasons, we grant enforcement of the Board's order.