571 F.2d 993
 97 L.R.R.M. (BNA) 3030, 83 Lab.Cas. P 10,388
 FORD MOTOR COMPANY (CHICAGO STAMPING PLANT), Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Local 588, United Automobile, Aerospace and Agricultural
Implement Workers of America, UAW, Intervenor.
 No. 77-1707.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 10, 1978.
Decided Feb. 22, 1978.
Rehearing and Rehearing En Banc Denied March 23, 1978.
 
 William J. Rooney, Dearborn, Mich., William W. McKittrick, Chicago, Ill., for petitioner.
 Elliott Moore, Deputy Associate Gen. Counsel, Linda E. Auerbach, William R. Stewart, Attys., N.L.R.B., Washington, D.C., for respondent.
 Before SWYGERT and SPRECHER, Circuit Judges, and GRANT, Senior District Judge.*
 SPRECHER, Circuit Judge.
 
 
 1
 The question in this appeal is whether in-plant cafeteria and vending machine food prices and services are "terms and conditions of employment" under Section 8(d) of the National Labor Relations Act, as amended, or materially or significantly affect or have impact upon such terms and conditions under the facts and circumstances of this case.[1]
 
 
 2
 The appeal comes here for review of an order of the National Labor Relations Board and upon the Board's cross-application for enforcement. On December 1, 1976, an Administrative Law Judge issued his decision recommending that the complaint be dismissed. The Board's decision and order issued on July 11, 1977, reversed the Administrative Law Judge and concluded that cafeteria and vending machine services and prices are mandatory subjects of collective bargaining. 230 NLRB No. 101 (1977).
 
 
 3
 * The petitioner, Ford Motor Company (Company), operates an automotive parts stamping plant in Chicago Heights, Illinois, where it employs approximately 3600 hourly-rated production employees working in three shifts and represented by the intervenor, Local 588 of the United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (Union). The Company and Union have been parties to a series of national collective bargaining agreements supplemented by local agreements. There is no other union in the plant.
 
 
 4
 The Company provides its employees with two air-conditioned cafeterias seating a total of 450-600 persons and five air-conditioned and enclosed vending machine areas, called "coke cribs," with a total seating capacity of 235-300 persons. All employees have a 30-minute lunch period. The parties agreed that it was not feasible for employees to leave the plant during their food breaks. Mobile food vending trucks are not permitted on plant property.
 
 
 5
 Employees are permitted to bring their own food into the plant and it may be eaten in the cafeteria or coke crib areas. However, the food brought in may only be stored in ventilated but not air-conditioned locker rooms. The employees have no refrigeration facilities and in the summer months the lockers become "very hot and sticky and smelly" with temperatures frequently ranging from 80 to 100 degrees and causing food spoilage. The Company has occasionally employed exterminator services because of unsanitary conditions in the locker rooms.
 
 
 6
 Based on physical counts of usage, it appeared that assuming a normal 5-day workweek, about 20-30% Of the employees used the Company cafeterias each day and, assuming that all employees used the vending machines, each employee used vending machines about 31/2 times per day.
 
 
 7
 The two cafeterias and five vending machine areas are serviced by a caterer, ARA Services, Inc., under a contract with the Company dated February 11, 1972, which provides that ARA shall:
 
 
 8
 furnish products of quality in accordance with purchasing specifications that shall have been submitted to and approved by Ford, and in accordance with a price and portion list for said manual food service and vending machines that shall have been submitted to Ford and that shall be subject to review at the request of Ford or contractor.
 
 
 9
 Under the agreement the Company furnishes rent-free space, rent-free equipment (except the vending machines), all needed utilities and maintenance whereas ARA furnishes the vending machines, all food and beverages, and management and labor. The agreement further provides that ARA shall be reimbursed for all direct costs of food and vending operations plus an allowance for general administrative costs equivalent to 4% Of net receipts plus a service fee of 5% Of net receipts. If gross receipts are less than the sum of the costs of the operation plus the service fee, the Company is obligated to reimburse ARA for the deficit by an annual amount not to exceed $52,000. For all recent years, the operation has been on a loss basis and the Company has made up the annual loss to ARA. Finally, the agreement provides that ARA is an independent contractor and that the contract is terminable by either party upon 60 days written notice.
 
 
 10
 Beginning with a letter dated October 29, 1967, from the Company to the Union entitled "Improved Vending and Cafeteria Service," the parties have bargained over various aspects of the quality of service provided by the caterer (at that time a predecessor of ARA). The 1967 letter provided in part that:
 
 
 11
 The Company recognizes its continuing responsibility for the satisfactory performance of the caterer and for providing the Union with a means for registering and expeditious handling of complaints concerned with such performance.
 
 
 12
 The letter, which was incorporated into the 1970 local collective bargaining agreement, dealt with the staffing of service lines, adequate cafeteria supervision, certain sanitary conditions, restocking and repairing of vending machines, and menu variety.
 
 
 13
 The local agreement in effect during the material times involved in this case became effective June 20, 1974, and continued through September 1976. The 1974 agreement included the above "recognition" clause in slightly modified language and other provisions dealing with cafeteria and vending services.[2]
 
 
 14
 The Company has consistently refused to bargain with the Union concerning prices set by ARA with its approval. The present controversy developed when the Company informed the Union that cafeteria and vending machine prices would be increased on February 9, 1976. By a letter to the Company dated February 13, the Union sought "to bargain with you regarding (cafeteria and vending) prices and services." On February 18, the Company responded by letter stating that "(s)imilar requests have been made by the Union in the past, and the Company's response has been the same, that food prices and services are not a proper subject for negotiations."[3]
 
 
 15
 Beginning on February 16, 1976, there was a boycott by Union members of the cafeteria and vending operations, which ended as to the cafeteria on May 19, 1976, and as to vending machines on June 7, 1976. The Administrative Law Judge found that "a substantial reason for abandoning the boycott was its ineffectiveness in reducing prices." He also noted that employees mostly brought in their lunches during the boycott and its termination was due in part to the onset of hot weather with consequent problems of spoilage of food.
 
 
 16
 Meanwhile on April 12, 1976, the Union had filed an unfair labor practice charge against the Company. On May 26, 1976, the Regional Attorney for the Board's General Counsel for Chicago issued a complaint against the Company. Our jurisdiction is derived from Sections 10(e) and (f) of the Act as amended (29 U.S.C. § 160), the alleged unfair labor practices having occurred in Illinois.
 
 II
 
 17
 As early as 1949, the National Labor Relations Board held that an employer had a statutory duty to bargain regarding the prices of meals served at logging camps. Weyerhaeuser Timber Co., 87 NLRB 672 (1949). Through the years the Board has persisted in its position that in-plant cafeteria and vending machine food prices and services are terms and conditions of employment and hence mandatory subjects of bargaining. Westinghouse Electric Corp., 156 NLRB 1080 (1966); McCall Corp., 172 NLRB 540 (1968); Package Machinery Co., 191 NLRB 268 (1971); and Ladish Co., 219 NLRB 354 (1975).
 
 
 18
 These last four cases were all reversed by courts of appeals. Westinghouse Electric Corp. v. N.L.R.B., 369 F.2d 891 (panel decision), 387 F.2d 542 (supervening en banc decision, 4th Cir. 1967); McCall Corp. v. N.L.R.B., 432 F.2d 187 (4th Cir. 1970); N.L.R.B. v. Package Machinery Co., 457 F.2d 936 (1st Cir. 1972); and N.L.R.B. v. Ladish Co., 538 F.2d 1267 (7th Cir. 1976).
 
 
 19
 The Board takes the view that an Administrative Law Judge's duty is to apply established Board precedent which the Supreme Court of the United States or the Board itself has not reversed, despite reversals of Board precedent by courts of appeals. Iowa Beef Packers, Inc., 144 NLRB 615, 616 (1963). In the present case, the Administrative Law Judge reasoned that despite the Board's precedents in Westinghouse, McCall, Package Machinery and Ladish, the reversals of those cases by courts of appeals followed by the failure of the Board to seek certiorari from the Supreme Court in the most recent case, N.L.R.B. v. Ladish Co., 538 F.2d 1267 (7th Cir. 1976), indicated that the Board had acquiesced and changed its former position. The Administrative Law Judge therefore recommended that the complaint against Ford Motor Company be dismissed.
 
 
 20
 The Board rejected the Administrative Law Judge's reasoning and said that "(w)ith all due respect to the First, Fourth, and Seventh Circuits, we adhere to our position that cafeteria and vending machine prices are a mandatory subject of bargaining." 230 NLRB No. 101 (1977).
 
 III
 
 21
 Section 8(a)(5) of the National Labor Relations Act, as amended,[4] makes it an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees . . . ." Collective bargaining is defined in Section 8(d) as:
 
 
 22
 the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . .[5]
 
 
 23
 The Supreme Court decision giving definitive substance to the words "terms and conditions of employment" is Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Inasmuch as what may be the key message of Fibreboard seems to have been overlooked or at least only summarily considered in subsequent cases, it is crucial to the outcome of this case to examine Mr. Chief Justice Warren's opinion for the Court and Mr. Justice Stewart's concurring opinion in some detail.
 
 
 24
 The Court's Fibreboard opinion goes to great pains to emphasize that each categorization of what is or is not a term or condition of employment or what has or has not sufficient effect or impact upon a term or condition so as to convert it into a mandatory subject of bargaining, must depend upon the facts and circumstances of each case. At the outset of the opinion, the Court said at 209, 85 S.Ct. at 402:
 
 
 25
 We agree with the Court of Appeals, that, on the facts of this case, the "contracting out" of the work previously performed by members of an existing bargaining unit is a subject about which the National Labor Relations Act requires employers and the representatives of their employees to bargain collectively.
 
 
 26
 (Emphasis added.)
 
 
 27
 At the end of the portion of the opinion dealing with this subject,[6] the Court said at 215, 85 S.Ct. at 405:
 
 
 28
 We are thus not expanding the scope of mandatory bargaining to hold, as we do now, that the type of "contracting out" involved in this case the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment is a statutory subject of collective bargaining under § 8(d). Our decision need not and does not encompass other forms of "contracting out" or "subcontracting" which arise daily in our complex economy.
 
 
 29
 The Stewart concurrence expanded further on the same theme[7] at 218, 85 S.Ct. at 407:
 
 
 30
 The question posed is whether the particular decision sought to be made unilaterally by the employer in this case is a subject of mandatory collective bargaining within the statutory phrase "terms and conditions of employment." That is all the Court decides. The Court most assuredly does not decide that every managerial decision which necessarily terminates an individual's employment is subject to the duty to bargain. Nor does the Court decide that subcontracting decisions are as a general matter subject to that duty. The Court holds no more than that this employer's decision to subcontract this work, involving "the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment," is subject to the duty to bargain collectively. Within the narrow limitations implicit in the specific facts of this case, I agree with the Court's decision.
 
 
 31
 (Emphasis added.)
 
 
 32
 Even as all "contracting out" situations are not necessarily either mandatory bargaining subjects or not mandatory bargaining subjects, not all in-plant cafeteria and vending machine food prices and services are necessarily one or the other. What is peculiarly and particularly a question of fact should not be converted into a matter of law, as Fibreboard strained to make clear. Having done this, Mr. Justice Stewart then sought to establish some guidelines for making the factual distinction. While much of his concurrence is applicable only to "contracting out" situations, some of his observations are applicable generally.
 
 
 33
 For example, he gave recognition to the standard that a particular matter may be either a term or condition of employment or may affect or have such an impact upon a term or condition that it nevertheless becomes a mandatory subject of bargaining. At the same time he limited that standard as not encompassing all matters which have an "effect-impact." He said at 223, 85 S.Ct. at 409:
 
 
 34
 While employment security has thus properly been recognized in various circumstances as a condition of employment, it surely does not follow that every decision which may affect job security is a subject of compulsory collective bargaining.
 
 
 35
 In many of these areas the impact of a particular management decision upon job security may be extremely indirect and uncertain, and this alone may be sufficient reason to conclude that such decisions are not "with respect to . . . conditions of employment."
 
 
 36
 (Emphasis added.)
 
 
 37
 Mr. Justice Brennan, writing for the Court in Allied Chemical Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 179, 92 S.Ct. 383, 397, 30 L.Ed.2d 341 (1971), said "(w)e agree with the Board that the principle of . . . Fibreboard is . . . whether (a particular matter) vitally affects the 'terms and conditions' of . . . employment."
 
 
 38
 Based principally upon the Stewart concurrence in Fibreboard, the courts of appeals have sought to further develop the standard for determining whether a particular matter "affects" or "has an impact upon" a term or condition of employment. Some courts have limited the "effect-impact" test by requiring a "material" or "significant" effect or impact (see Seattle First National Bank v. N.L.R.B., 444 F.2d 30, 33 (9th Cir. 1971)), or a "substantial adverse effect" upon the employees (see District 50, United Mine Workers v. N.L.R.B., 358 F.2d 234, 237 (4th Cir. 1966).[8]
 
 IV
 
 39
 Applying the Fibreboard principles to the case at hand will perhaps be simpler if we first determine how they have been applied in this circuit generally and in this and other circuits specifically to in-plant feeding.
 
 
 40
 This court adopted the case-by-case approach in interpreting the analogous phrase "working conditions" in the Railway Labor Act,[9] holding that "(t) he Act does not fix or authorize anyone to fix generally applicable standards for working conditions . . . ." In re Chicago North Shore & M. R. Co., 147 F.2d 723, 727 (7th Cir.) cert. denied, 325 U.S. 852, 65 S.Ct. 1089, 89 L.Ed. 1973 (1945).
 
 
 41
 In N.L.R.B. v. Ladish Co., 538 F.2d 1267, 1272 (7th Cir. 1976), the Court said that "(w)e hold that vending machine food prices are not a material or significant condition of employment at Ladish " (emphasis added). Furthermore, the opinion of Judge Pell which relies upon Fibreboard and upon Seattle First National Bank v. N.L.R.B., supra, makes it clear that the Court is applying the material or significant effect or impact standard rather than what may seem to be an entirely different standard of "material or significant condition," which, of course, would be contrary to the statute itself.[10]
 
 
 42
 The result in the Ladish case and the seemingly contrary dicta in Inland Steel Co. v. N.L.R.B., 170 F.2d 247, 251 (7th Cir. 1948), cert. denied, 336 U.S. 960, 69 S.Ct. 889, 93 L.Ed. 1112 (1949), that "a provision for in-plant feeding . . . could properly be designated as 'wages,' and . . . (is one of the) 'conditions of employment,' " are easily reconciled on this basis, namely, that this circuit applies the case-by-case approach and the standard of review of material or significant effect or impact upon a term or condition of employment.
 
 
 43
 In two of the other three in-plant food cases, the case-by-case approach was used. Westinghouse, supra 387 F.2d at 547 (". . . it appears that the Supreme Court's decision in Fibreboard was limited to a particular situation . . . ."); McCall, supra 432 F.2d at 187 (Westinghouse was decided "under the circumstances of the case"). Nothing was said in this regard in Package Machinery, supra, which relied heavily, however, on Westinghouse and McCall. Both Westinghouse and McCall also applied the standard of review of material or significant effect or impact. See footnote 8, supra.
 
 
 44
 Finally, in the closely-analogous cases determining whether company-furnished housing is a term or condition of employment, courts have held that the result depends upon an evaluation of the relevant facts of the particular case. See American Smelting & Refining Co. v. N.L.R.B., 406 F.2d 552, 553-554 (9th Cir.), cert. denied, 395 U.S. 935, 89 S.Ct. 1998, 23 L.Ed.2d 450 (1969).
 
 V
 
 45
 Whether in-plant cafeteria and vending machine food prices and services are a term or condition of employment is a close and difficult question.
 
 
 46
 Mr. Justice Stewart, concurring in Fibreboard Corp. v. N.L.R.B., 379 U.S. 203, 222, 85 S.Ct. 398, 409, 13 L.Ed.2d 233 (1964), said that "(i)n common parlance, the conditions of a person's employment are most obviously the various physical dimensions of his working environment" and "(w)hat one's hours are to be, what amount of work is expected during those hours, what periods of relief are available, what safety practices are observed, would all seem conditions of one's employment." The food one must pay for and eat as a captive customer within the employer's plant can be viewed as a physical dimension of one's working environment.
 
 
 47
 Ladish itself recognized that some aspects of in-plant feeding are terms and conditions of employment. The Court there noted that "(t)he Company does not dispute that it is required to bargain over hours of employment, including the lunch period." 538 F.2d at 1271. This Court in Ladish, however, distinguished "the vague dicta in Inland Steel, which in any event could mean nothing more than the obvious requirement that a company would have to bargain on some phases of 'in-plant feeding,' e.g., the period of time for the purpose." Id. at 1272.
 
 
 48
 The following analogous matters have been held to be terms or conditions of employment and hence mandatory subjects of collective bargaining:
 
 
 49
 Safety rules and practices N.L.R.B. v. Gulf Power Co., 384 F.2d 822, 825 (5th Cir. 1967).
 
 
 50
 Rules concerning employee discipline, smoking and dress S. S. Kresge Co. v. N.L.R.B., 416 F.2d 1225, 1229-1230 (6th Cir. 1969).
 
 
 51
 Rental rate for company-furnished housing American Smelting & Refining Co. v. N.L.R.B., 406 F.2d 552 (9th Cir.), cert. denied, 395 U.S. 935, 89 S.Ct. 1998, 23 L.Ed.2d 450 (1969); N.L.R.B. v. Lehigh Portland Cement Co., 205 F.2d 821 (4th Cir. 1953).
 
 
 52
 Gas price discount for employees N.L.R.B. v. Central Illinois Public Service Co., 324 F.2d 916 (7th Cir. 1963).
 
 
 53
 Level of heat in plant N.L.R.B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).
 
 
 54
 But despite the fact that we are dealing with a close question, we accept, as we must in the absence of en banc consideration, the holding of Ladish, which we interpret to mean that under the facts and circumstances Ladish in-plant vending machine food prices were not a term or condition of employment.
 
 
 55
 We hold, however, that under the facts and circumstances of this case, in-plant cafeteria and vending machine food prices and services materially and significantly affect and have an impact upon terms and conditions of employment, and therefore are mandatory subjects of bargaining.
 
 
 56
 The facts and circumstances of this case (set forth in Part I) differ from those in Ladish, Westinghouse, McCall and Package Machinery as summarized in chart form as follows:
 
 
 57
 Ford Ladish
 ------------- -----------
Number of Unions 1 7
Subsidization
 Rent-free space Yes Yes
 Rent-free equipment Yes No
 Utilities Yes Yes
 Maintenance Yes No
 Cash (per year) $52,000 No
Employer Control
 Prices Yes No
 Food quality Yes No
Use of Facilities
 Cafeteria 20-30$ None
 Vending machines 3-1/2 per day 70%
Time for Lunch 30 mins. 15 mins.
Alternatives
 Outside restaurant Inadequate Not allowed
 Paper-bagging Not feasible 30%
 Mobile vendors Not allowed Not allowed
Attempted Boycott Failed None
Prior Bargaining Since 1967 None
 TABLE CONTINUED
Westinghouse McCall Package
------------ ----------- -----------
3 Several 1
Yes ) Yes
Yes ) Yes
Yes ) Company- Yes
Yes ) operated Yes
$1800 once ) $8940
Yes Yes Yes
Yes Yes Yes
40-45% No evidence 50%
Not at issue 25-95% 98%
30-45 mins. 10-30 mins. 20-30mins.
Inadequate Adequate Several
55-60% Some Yes
Yes Yes No evidence
None None None
None None None
 
 
 58
 We continue to operate under the constraints of Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), which referred to the National Labor Relations Board "as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." The Board made the following distinctions between the present case and Ladish :
 
 
 59
 Unlike Ladish, where the respondent had no input on prices, the Respondent in this case retains influence over cafeteria and vending machine prices by its right to review prices and its leverage of the subsidy agreement. In addition, there also exists the possibility for the Respondent to make a profit on the food service operation. Also, since 1967, the parties in this case have bargained over in-plant food services. No such bargaining history was present in Ladish. Moreover, in Ladish, the court implied that "brown-bagging" is a viable alternative to purchasing lunch from the commercial food service. However, in this case, employees have complained about spoilage of food stored in their lockers until lunch, as well as unsanitary conditions in the locker room (wherein the Respondent has found it necessary on occasion to exterminate). Additionally, the employees have apparently been so concerned with the food pricing that over half of them participated in a boycott of the Respondent's food service operations. There was no such labor strife involved in Ladish. Lastly, in Ladish the employees were represented by seven unions. The court therein projected that each time the food prices were raised "the Company could be compelled to engage in seven rounds of negotiations." 538 F.2d at 1272. This fact, the court declared, "provides a good example of a situation in which bargaining could be both disruptive of stable employee relations and economically wasteful." Id. In the instant case, however, the employees are represented by a single union. While we adhere to the view that the number of unions representing employees at a single plant is not a factor in resolving this issue, we nevertheless note that, even in the court's view, there is no potential for conflicting union demands in this case.
 
 
 60
 We agree with the Board that the distinctions which it has found are material and significant, that those distinctions have an effect and impact upon terms and conditions of employment, and that therefore in-plant cafeteria and vending machine food prices and services are mandatory subjects of bargaining under the facts and circumstances of this case.
 
 
 61
 This result will not be unduly burdensome to the Company. The obligation to bargain upon terms and conditions of employment "does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d). The order we are enforcing does not require the Company to bargain about every proposed price change in food prices before putting such change into effect but "to bargain on such price change only after . . . (it is) determined unilaterally and upon a request of the Union."The Board's order of July 11, 1977, is enforced and the Company's petition for review is denied.
 
 
 
 *
 Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation
 
 
 [1]
 29 U.S.C. § 158(d)
 
 
 [2]
 1. CAFETERIA SERVICE
 The company assures the Union that steam table items will be available at all times during the regular lunch period and that a comparable selection of entrees, salads and desserts will be available during all regular lunch periods. In addition, the Company will make arrangements for a delicatessen type sandwich service in the cafeteria. Cafeteria supervision will be available during all lunch periods to ensure that employees will be served in a reasonable length of time through the main serving lines as well as to provide for the adequacy of food service, condiments and utensils.
 
 
 [2]
 VENDING SERVICE AND VARIETY
 To assure that vending machines will receive prompt servicing in the event of a mechanical breakdown, a sticker will be affixed to each machine indicating the number to call for repair. Further, the Company assures the Union that a greater variety of selections will be maintained in the existing vending machines and that the quality of such items will continue to meet Company standards.
 The Company recognizes its continuing responsibility for the satisfactory performance of the caterer and for the expeditious handling of complaints concerned with such performance.
 
 
 [3]
 By letter of March 23, 1976, the Union requested from the Company information regarding cafeteria and vending machine operations, including the Company's maintenance responsibilities, profits from food operations, control of prices and contractual relations with the caterer. On April 9, the Company denied the Union's request for information. Most if not all the information requested was disclosed in the proceedings before the Board. The Board found and concluded that the requested information was relevant to food prices and services, and that its disclosure was necessary to the Union's fulfilling its duty as a bargaining agent
 
 
 [4]
 29 U.S.C. § 158(a)(5)
 
 
 [5]
 29 U.S.C. § 158(d). The original National Labor Relations Act of 1935 (the Wagner Act) did not contain a definition of collective bargaining, but Section 9(a) provided that a majority union shall be the exclusive representative of all employees in an appropriate unit "for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . ." (Emphasis added.) When the Labor Management Relations Act of 1947 (the Taft-Hartley Act) substantially amended the National Labor Relations Act, Section 9(a) was left unchanged and Section 8(d) was first included. The parties to this case have not directed our attention to, nor has our own research located, any legislative history which would be particularly persuasive in an attempt to give further content to the phrase "terms and conditions of employment" in Section 8(d) or "conditions of employment" in Section 9(a). See Legislative History of the Labor Management Relations Act, 1947 (G.P.O., 1948), Vols. I and II. Possibly the only assistance in interpreting these phrases which the history affords is summarized by Mr. Justice Stewart in his concurring opinion in Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203 at 220-221, 85 S.Ct. 398 (1964)
 
 
 [6]
 In the middle of the opinion the Court said that "(t)he facts of the present case illustrate the propriety of submitting the dispute to collective negotiation." (Emphasis added.) 379 U.S. at 213, 85 S.Ct. at 404
 
 
 [7]
 More recently, in Allied Chemical Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 179, 92 S.Ct. 383, 397, 30 L.Ed.2d 341 (1971), the Supreme Court held that "in each case the question is . . . whether (a particular matter) vitally affects the 'terms and conditions' of . . . employment."
 
 
 [8]
 As applied to in-plant cafeteria and vending machine food prices and services see Westinghouse, supra 387 F.2d at 548 (". . . a significant or material relationship to wages, hours, or other conditions of employment") and McCall, supra 432 F.2d at 188 ("whether the issue 'materially affects the conditions of employment' ") (Sobeloff, J., dissenting)
 
 
 [9]
 Section 2, First of the Railway Labor Act provides that "(i)t shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . .." (Emphasis added.) 45 U.S.C. § 152, First
 
 
 [10]
 29 U.S.C. § 158(d) makes terms and conditions of employment mandatory subjects of collective bargaining, whether material or significant or not. Fibreboard expanded the plain meaning of the statute to include matters having material or significant effect or impact upon terms or conditions