**KEYSTONE STEEL & WIRE, DIVISION OF KEYSTONE CONSOLIDATED INDUSTRIES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–2215.

United States Court of Appeals, Seventh Circuit.

Argued April 17, 1979.

Decided Sept. 12, 1979.

---

Frederic H. Fischer, Chicago, Ill., for petitioner.

David Fleischer, N.L.R.B., Washington, D. C., for respondent.

Before FAIRCHILD, Chief Judge, and PELL and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The sole issue is whether the change in administrators of a company's hospital, medical and surgical benefits program is a term and condition of employment under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, subject to mandatory collective bargaining.

Keystone Steel & Wire, Division of Keystone Consolidated Industries, Inc., petitions this court to set aside the National Labor Relations Board decision and order, *Keystone Steel & Wire*, 237 N.L.R.B. No. 91 (1978), which concluded that Keystone, during the term of a collective bargaining agreement and after bargaining with the Independent Steel Workers Alliance, changed without assent the administrator of Keystone's hospital, medical and surgical benefits program breaching the notice provisions of § 8(d)(3) of the National Labor Relations Act and violating § 8(a)(1) and (5) of the Act in refusing to bargain in good faith with the Union. 29 U.S.C. §§ 158(a)(1), 158(a)(5), 158(d)(3).[1] The Board cross-applied for enforcement of the order.

---

1. The National Labor Relations Act provides in pertinent part:

§ 158. Unfair labor practices.
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
\* \* \* \* \* \*
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
\* \* \* \* \* \*
(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—
\* \* \* \* \* \*
(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time;
§ 157. Right of employees as to organization, collective bargaining, etc.
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

Keystone, a Delaware corporation, operates a steel and wire mill in Bartonville, Illinois, and employs approximately 2000 maintenance and production employees. Since 1948 these employees have been exclusively represented in collective bargaining with Keystone by the Independent Steel Workers Alliance. The Company and the Union have entered into a series of collective bargaining agreements. The most recent agreement, dated May 1975, is effective until May 1981.

Keystone provides its employees with four different programs of insurance and health care benefits: a life insurance program, sickness and accident weekly benefits for employees unable to work because of non-occupational injuries or illnesses, a dental expense benefits program,[2] and a hospital, medical and surgical benefits plan. The current collective bargaining agreement provides that the insurance and health care agreement remains in effect for the term of the collective bargaining contract.[3] Blue Cross-Blue Shield (Blue Cross) was specifi-

cally named in the Keystone insurance plan booklet as the administrator of the hospital, medical and surgical benefits plan. *See* footnote 3. Under the program Keystone advanced funds to Blue Cross to pay the benefits, and Blue Cross charged Keystone an administrative fee equal to a certain percentage of the claims paid. The employees contributed nothing while Keystone assumed the complete financial obligation for paying all benefits for eligible employees. The level of benefits was determined by collective bargaining between Keystone and the Union. Blue Cross initially processed the claims. If Blue Cross denied an employee's claim, the plan required that Blue Cross provide the employee prompt notice of the refusal, written in a comprehensible manner and stating the specific reasons for the denial. The employee could obtain a review of the denial by the Keystone insurance manager or the joint insurance committee, which consisted of Keystone and Union representatives. If the employee's claim was still denied, he could seek relief through legal action.

§ 159. Representatives and elections—Exclusive representatives; employees' adjustment of grievances directly with employer

(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment.

2. Keystone also changed the administrator of the dental expense program from Aetna Life & Casualty Company to Metropolitan Life Company. Noting that the General Counsel presented no evidence regarding the administration of the dental plan under Aetna or Metropolitan, the Board found that Keystone "did not violate the Act in changing the administrator/processor of the dental expense program." *Keystone Steel & Wire,* 237 N.L.R.B.

No. 91 at 13 (1978). The General Counsel has not appealed that finding.

3. Regarding health care benefits, the basic agreement states:

The Company agrees that the following agreements will remain in effect during the term of this agreement all as heretofore agreed upon and as revised:
Pension
Insurance and health care
Security Benefit
Apprentice
Incentive Study (11–4–70)
Profit Share (1960)
(The language of such agreements is separate from and not a part of this agreement).
In accord with that paragraph, the current insurance plan booklet provides:
Keystone Steel & Wire Division is assuming complete financial liability as to the hospital, medical, and surgical expense benefits. Blue Cross/Blue Shield of Chicago, Illinois is named as administrator of the Benefit program and processor of benefit payments from funds provided by Keystone Steel & Wire Division.
The preceding insurance plan booklet, dated 1972, was replete with specific references to Blue Cross, and the 1966 collective bargaining agreement expressly provided that Blue Cross was the insurance "carrier."

Keystone's corporate management became concerned about the constantly increasing administrative costs the corporation's various divisions nationwide were paying for the administration of over 30 benefit programs. In November 1976 the Company advised the Union that it was considering a proposal to consolidate all the benefit programs in one administrative company. Keystone estimated that due to differing administrative charges the change from Blue Cross to Metropolitan Life Company would save the Bartonville plant over $100,000 a year. The Company and the Union held meetings and exchanged correspondence through 1977 discussing the proposed substitution of administrators but the parties could not reach an agreement.[4] On November 1, 1977, Keystone, after bargaining with the Union, but without the Union's assent, changed the administrator of the hospital, medical and surgical benefits program from Blue Cross to Metropolitan.[5] Keystone effected the change, however, without first serving notice pursuant to 29 U.S.C. § 158(d)(3) on the Federal Mediation and Conciliation Service or on the Illinois State Department of Labor of Keystone's desire to modify the collective bargaining agreement with the Union or of the existence of a dispute between Keystone and the Union. Later, the Union filed an unfair labor practice charge against the Company.

On November 26, 1977, the General Counsel of the National Labor Relations Board issued a complaint against the Company. In March 1978 a hearing was held before an administrative law judge, and, at the close of the hearing, the parties agreed to waive the judge's decision and submit the matter based upon the record directly to the Board for a decision.

The Board concluded, after comparing the Blue Cross and Metropolitan plans, that the identity of the administrator of Keystone's hospital, medical and surgical benefits program had a vital effect on the terms and conditions of employment of the employees and therefore was a mandatory subject of bargaining. *Keystone Steel & Wire*, 237 N.L.R.B. No. 91 (1978). For a remedy the Board ordered that Keystone cease and desist from refusing to bargain collectively in good faith with the Union regarding terms and conditions of employment, from making unilateral changes in the identity of the administrator of the hospital, medical and surgical benefits program without first reaching agreement with the Union, and from restraining, coercing or interfering with employees in the exercise of their rights to, among others, organize and bargain collectively. Affirmatively, the Board announced that, if the Union requested reinstatement within a certain time the Company would be ordered to reinstate Blue Cross as the plan administrator.

---

4. The Company and Union positions may be understood from the following correspondence. On September 13, 1977, Keystone explained to the Union in a letter that due to differing administrative charges the change to Metropolitan could save the Bartonville plant, already in a serious financial situation, over $100,000 a year while providing the employees with the same benefits. The letter stated further that nothing in the collective bargaining agreement restricted the Company's right to substitute an insurance administrator, the Company satisfied any obligation to bargain with the Union, and, since neither Blue Cross nor Metropolitan was in fact an insurance carrier, there was no duty under the National Labor Relations Act to bargain with the Union. "Since the Union's apparent objective is to oppose any change unless the company in effect buys the Union's consent by providing increased benefits," Keystone apprised the Union that, effective November 1, 1977, Metropolitan would be the new insurance administrator. The Union responded in a letter

on September 26, 1977, saying that it was not interested in changing the health insurance carrier because the Union could not understand from the information provided how the Company could cut costs without cutting benefits and because a change during the term of the current agreement "would in some degree be an economic disadvantage and an undue hardship" upon the Union members.

5. Keystone implemented the insurance consolidation plan nationwide on October 1, 1977. Keystone named Metropolitan as the administrator for approximately 30 other benefit plans. Keystone did not ask Blue Cross to submit a bid because Blue Cross could not provide the national service needed to administer the different plans. According to the petitioner in its brief, although other unions represent other Keystone employees at other divisions, no other union filed any contract grievance or unfair labor practice charge challenging this change.

The National Labor Relations Act, as amended, provides that it shall be an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Collective bargaining is defined as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." *Id.* § 158(d). Those provisions obligate the employer and the employees' representative to bargain with each other in good faith with respect to "wages, hours, and other terms and conditions of employment." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964); *NLRB v. Wooster Division of Borg-Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed. 823 (1958).

The task we face is the application of the Section 158(d) phrase, "terms and conditions of employment" to particular circumstances. The legislative history lends us no specific guidance. The Supreme Court commented in *Allied Chemical & Alkali Workers, Local 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 178, 92 S.Ct. 383, 397, 30 L.Ed.2d 341 (1971), "Section 8(d) of the Act, of course, does not immutably fix a list of subjects for mandatory bargaining. . . But it does establish a limitation against which proposed topics must be measured. In general terms, the limitation includes only issues that settle an aspect of the relationship between the employer and employees." (Citations omitted.) *See also Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. at 220–21, 85 S.Ct. 398 (Stewart, J., concurring). Recently, the Supreme Court

observed that the legislative history evidenced a congressional desire to delegate to the National Labor Relations Board the primary responsibility of selecting the subject matters for mandatory bargaining. *Ford Motor Co. v. NLRB*, —— U.S. ——, ——, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979). The Court reasoned:

> Because it is evident that Congress assigned to the Board the primary task of construing these provisions in the course of adjudicating charges of unfair refusals to bargain and because the "classification of bargaining subjects as 'terms or conditions of employment' is a matter concerning which the Board has special expertise," *Meat Cutters v. Jewel Tea*, 381 U.S. 676, 685–686[, 85 S.Ct. 1596, 14 L.Ed.2d 640] (1965), its judgment as to what is a mandatory bargaining subject is entitled to considerable deference.[6]

*Id.* Of course, the judgment of the Board remains subject to judicial review.

In *Allied Chemical & Alkali Workers, Local 1 v. Pittsburgh Plate Glass Co.* the Supreme Court stated, "We agree with the Board that the principle of *Oliver*[7] and *Fibreboard*[8] is relevant here; in *each case* the question is not whether the third-party concern is antagonistic to or compatible with the interests of bargaining-unit employees, but whether it *vitally affects* the 'terms and conditions' of their employment." 404 U.S. at 179, 92 S.Ct. at 397–398 (emphasis added). Following *Pittsburgh Plate Glass*, both the Board and Keystone assert on appeal that the applicable test is whether in this case this administrator change *"vitally affects"* the terms and conditions of employment. Keystone argues that the Board applied the "vitally affects" test inconsistently, sometimes using a "sub-

6. The Supreme Court also stated:

It is thus evident that Congress made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain. . . . Construing and applying the duty to bargain and the language of § 8(d), "other terms and conditions of employment," are tasks lying at the heart of the Board's function.

*Ford Motor Co. v. NLRB*, —— U.S. ——, —— ——, 99 S.Ct. 1842, 1848–1849, 60 L.Ed.2d 420 (1979).

7. *Local 24, International Brotherhood of Teamsters v. Oliver*, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959).

8. *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

stantial and significant" or a "significant impact" test. If the Board did apply the "vitally affects" test, Keystone's position is that the Board wrongly concluded that the test was satisfied.

■ *Ford Motor Co. v. NLRB,* —— U.S. ——, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979), decided after oral argument in this case, casts considerable doubt upon the joint view of the parties that the "vitally affects" test applies to the facts of the present case. Ford argued against classifying cafeteria and vending machine food prices and services furnished by a third-party supplier within the plant as mandatory bargaining subjects since they did not "vitally affect" the terms and conditions of employment within the meaning of *Pittsburgh Plate Glass.* The Supreme Court found no merit in that argument and explained:

> *Pittsburgh Plate Glass* . . . made it clear that while § 8(d) normally reaches "only issues that settle an aspect of the relationship between the employer and employees . . . matters involving individuals outside the employment relationship . . . are not wholly excluded." *Id.,* at 178[,92 S.Ct. 398]. In such instances, as in *Teamsters Union v. Oliver,* 358 U.S. 283[, 79 S.Ct. 297, 3 L.Ed.2d 312] (1959), and *Fibreboard Corp. v. NLRB,* 379 U.S. 203[, 85 S.Ct. 398, 13 L.Ed.2d 233] (1964), the test is not whether the "third-party concern is antagonistic to or compatible with the interests of bargaining-unit employees, but whether it vitally affects the 'terms and conditions' of their employment." 404 U.S. at 179[, 92 S.Ct. 398]. Here, however, the matter of in-plant food prices and services is an aspect of the relationship between Ford and its own employees. No third-party interest is directly implicated, and the standard of *Pittsburgh Plate Glass* has no application.

*Ford Motor Co. v. NLRB,* —— U.S. at ——, 99 S.Ct. at 1851. As there is great similarity between the circumstances of Ford and the present case, the "vitally affects" standard is inapplicable because the subject matter is "an aspect of the relationship"

between Keystone and its employees without a third-party interest being directly implicated.

■ Insurance benefits for active employees are a mandatory subject of collective bargaining as "wages" or "terms and conditions" under the National Labor Relations Act. *Allied Chemical & Alkali Workers, Local 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 159, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). However, there is little guidance on the issue of whether a change in administrators of the employees' group health insurance program is a mandatory subject for bargaining. Generally, cases have followed the case-by-case approach. In *Bastian-Blessing v. NLRB,* 474 F.2d 49 (6th Cir. 1973), the company, without prior bargaining with the union, unilaterally terminated the employees contributory group health insurance plan with Aetna Life Insurance Company (Aetna) and instituted a company self-insurance program. There the Board found that the change materially affected the employees because the new plan, among other things, completely omitted two "significant" benefits and deleted other pertinent prior provisions governing the payment of benefits which caused an "adverse impact on the employees' previously-negotiated benefits." *Id.* at 51–52. In concluding that the specific insurance carrier for an employee group health program was a mandatory subject of bargaining, the Sixth Circuit stressed that the conclusion was governed "by the facts of this case" and made no attempt to categorize the subject matter as "terms and conditions of employment."

The Second Circuit distinguished *Bastian-Blessing* in *Connecticut Light & Power Co. v. NLRB,* 476 F.2d 1079 (2d.Cir.1973), and held that "the selection of an insurance carrier under the circumstances presented here is not a mandatory subject for bargaining within Section 8(d)" of the Act. *Id.* at 1080. In that case the company provided its union employees with a non-contributory, company-paid medical-surgical plan. The carrier of the insurance program was Aetna Life Insurance Company. In 1969

the union informed the company of its dissatisfaction with Aetna's administration of the plan and subsequently the company secured various changes from the carrier. In the 1971 collective bargaining negotiations the union again expressed its dissatisfaction with Aetna and attempted to reinstate a former carrier, Blue Cross. During those negotiations the company bargained about coverage, benefits and administration of the program but resolutely refused to discuss the selection of the carrier maintaining that the choice of a carrier was the company's unilateral right. Thereafter, the union filed a charge with the Board alleging a refusal by the company to bargain in violation of Section 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1) and (5). The Board subsequently found that the company "had unlawfully refused to bargain as to the selection of an insurance carrier for the employee medical benefits plan." *Id.* at 1081. The court of appeals distinguished the *Bastian-Blessing* decision:

> Here, there have been no specific allegations of any changes in coverage, levels or administration of the plan. All the Union has alleged is general "dissatisfaction" with Aetna. Equally important, the Company has responded to specific complaints with good faith negotiation; and, as the Board found, the Company has been able to obtain modifications from Aetna.

*Id.* at 1082–83. The Second Circuit also distinguished the National Labor Relations Board's cases: "Similarly, the other cases cited to us which required bargaining with regard to the carrier of the employees' insurance plans involved substantive changes in benefits which dictated the results. *E.g.,* Wisconsin Southern Gas Co., 173 N.L.R.B. 480 (1968); Wabana, Inc., 146 N.L.R.B. 1162 (1964)." 476 F.2d at 1082. In concluding the court remarked:

> Consequently, we are unable to conclude that the Company has violated its obligation to bargain under *Pittsburgh Plate Glass.* The Company at no time has refused to negotiate with the employees as to any subject that "vitally affects the 'terms and conditions' of their employment." *Chemical Workers, Local 1 v. Pittsburgh Plate Glass Co., supra,* 404 U.S. at 179[, 92 S.Ct. 383]. In *Westinghouse Electric Corp. v. NLRB,* 387 F.2d 542, 548 (4 Cir. 1967) (en banc), the court observed that:

> "[S]ince practically every managerial decision has some impact on wages, hours, or other conditions of employment, the determination of which decisions are mandatory bargaining subjects must depend upon whether a given subject has a significant or material relationship to wages, hours, or other conditions of employment."

> The benefits, coverage and administration of the plan in the instant case clearly are proper bargaining subjects.

> We hold that the Company, having negotiated about those matters, was free to choose any carrier that would satisfy the Company's agreement with the Union.

476 F.2d at 1083.

This circuit has accepted the Board's conclusion "that the term 'wages' . . . must be construed to include emoluments of value, like pension and insurance benefits, which may accrue to employees out of their employment relationship." *Inland Steel Co. v. NLRB,* 170 F.2d 247, 251 (7th Cir. 1948), *cert. denied on this issue,* 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949), *aff'd on other grounds sub nom. American Communications Association v. Douds,* 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950). We held there that retirement and pension benefits were a mandatory subject of collective bargaining under what was then Section 8(a)(5) of the Act as either "wages" or "other conditions of employment." We have not addressed the precise issue presented here, but we have previously adopted the case-by-case approach and the legal test of material or significant effect or impact upon a term or condition of employment. *Ford Motor Co. (Chicago Stamping Plant) v. NLRB,* 571 F.2d 993, 999 (7th Cir. 1978), *aff'd, Ford Motor Co. v. NLRB,* —— U.S. ——, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979). *See also NLRB v. Ladish Co.,* 538 F.2d 1267, 1272 (7th Cir. 1976); *Inland*

*Steel Co. v. NLRB,* 170 F.2d 247, 251 (7th Cir. 1948), *cert. denied,* 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949). *See generally In re Chicago North Shore & M. R. Co.,* 147 F.2d 723, 727 (7th Cir.), *cert. denied,* 325 U.S. 852, 65 S.Ct. 1089, 89 L.Ed. 1973 (1945).

In the present case the Board found these differences in the two competing programs: (1) the "usual and customary" fee allowances of Blue Cross and Metropolitan are not identical for the same claim, (2) Metropolitan processes claims more quickly, (3) Metropolitan answers requests for information more swiftly, (4) Blue Cross, unlike Metropolitan, provides a labor consultant, (5) the Blue Cross procedure for a claimant filing surgical claims requires less effort and paperwork, and (6) the Blue Cross conversion plan, which enables employees who terminate their employment with Keystone to continue their insurance coverage, costs more but provides greater coverage. The Board admitted that "certain aspects of Metropolitan's performance as administrator may appear superior to Blue Cross' performance." 237 NLRB No. 91 at 10. If we were to consider the merits of the two programs, we would wonder why the Union opposed the change as on balance the Metropolitan program appears beneficial to the Union as well as to the Company. Keystone suggests that the Union's objection to the changeover is merely a ploy to reopen negotiations midterm and seek increased benefits. Keystone also argues that nothing more was involved than a simple change of administrators which it is free to make. In our view this switch in administrators brought other changes which have a material and significant effect or impact upon the terms and conditions of employment. The change therefore becomes a mandatory subject of bargaining. Among the material effects, one impact was the loss of the Blue Cross labor consultant to assist with claim problems. Significant effects also resulted in the schedules of customary allowances for various operations where some general observations are possible but a complete comparison is difficult.[9]

We note that the allowance amounts for Blue Cross and Metropolitan show differences in payments for many procedures. For example, Blue Cross pays $500 more for the excision of a brain tumor, $100 to $200 more for a simple mastectomy, $125 more for a tibia and fibula fracture, and $100 more for a miscarriage.

As we view this particular case either under the vitally affects test in *Pittsburgh Plate Glass* or in the light of the recent decision in *Ford Motor Company,* the result would be the same. The subject was a matter for mandatory, not merely permissive, bargaining.

The remainder of the Company's arguments are not persuasive. First, we are unpersuaded by Keystone's stand-by argument that Metropolitan's usual and customary fee determination is not the last word on whether the employee's entire claim will be paid because, as stated earlier, the employee may obtain a review of the decision by the Keystone insurance manager or the joint insurance committee and, if the review is denied, seek redress through litigation. The contention is acceptable in theory but unsatisfactory in fact. The record shows there is no evidence that the insurance committee ever overruled the administrator's determination or that an employee ever secured more payments through litigation. Second, the Company claims that the administrator of its health care benefits program is Keystone's "representative" within the meaning of Section 158(b)(1)(B) of the Act which allows the employer the right to select "his representatives for the . . . adjustment of grievances [without bargaining with the Union]." 29 U.S.C. § 158(b)(1)(B).[10] Sec-

---

9. There is a quarrel between Keystone and the Board as to the geographical area used under each program as a basis for determining the customary fees but the difference is immaterial because a change nonetheless results.

10. Section 158(b)(1)(B) provides in relevant part:

(b) It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce . . . (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances.

tion 158(b)(1)(B) pertains to "actual labor grievances in which the employer may be vitally interested and to which he is a party." *Associated General Contractors of America, Evansville Chapter, Inc. v. NLRB*, 465 F.2d 327, 332 (7th Cir. 1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 907, 34 L.Ed.2d 689 (1973). As stated in the health care booklet, see footnote 3, Blue Cross was named the administrator of the hospital, medical and surgical benefits program and not Keystone's agent for settling actual labor grievances. Third, the Company asserts that since the collective bargaining agreement, see footnote 3, did not expressly prohibit Keystone from changing administrators, the Company is free to effectuate the change. This circuit has emphasized before that "[a]ny waiver of the Union's right to bargain about conditions of employment must be 'clear and unmistakable.'" *Murphy Diesel Co. v. NLRB*, 454 F.2d 303, 307 (7th Cir. 1971). In light of our discussion above about the significance of the subject matter under the facts and circumstances of this case, we think it is enough that no clause in the contract explicitly authorized a change of administrators during the term of the agreement, that Blue Cross was specifically named as the administrator of the program, and that the current contract provided that the existing health care plan would remain in effect until 1981. Last, we find nothing improper in applying Section 158(d) to midterm contract violations, see *NLRB v. Scam Instrument Corp.*, 394 F.2d 884, 887 (7th Cir. 1968).

■ The Board's remedy for this problem, however, seems heavy handed, disruptive and overly broad. In addition to remedying the specific violation and prohibiting any "like or related" action, Keystone is ordered to cease and desist from "refusing to bargain collectively in good faith" with the Union and to reinstate Blue Cross as the plan administrator upon the Union's request. The order goes beyond the unlawful conduct in issue. *NLRB v. Thompson Ramo Wooldridge, Inc.*, 305 F.2d 807, 811 (7th Cir. 1962). Keystone sought the

change from Blue Cross to Metropolitan as part of a nationwide effort to centralize the administration of about 30 employee benefit plans and thereby cut costs, a motive hardly deserving criticism. It is conceded that Blue Cross is unable to supply this same service for all of Keystone's companies across the country. The Board gives no justification whatsoever for the disruptive order which requires Keystone to dismiss Metropolitan and reinstate Blue Cross upon the Union's request. Keystone as an alternative seeks an order requiring it only to correct any existing detrimental differences. We agree that a more rational and reasonable solution is worthy of the Board's further consideration.

The order of the Board, except its present remedial provisions, is enforced as modified, and the case is remanded to the Board for further consideration and adoption of an appropriate and more limited remedy in keeping with this opinion.

PELL, Circuit Judge, concurring.

The majority opinion in this case states that the sole issue is whether the change in administrators of a company's hospital, medical, and surgical benefits program is a term and condition of employment under the National Labor Relations Act, subject to mandatory collective bargaining. If this were indeed all that is involved in the present case, I would regard it as clear that the mere change of the administrator was nothing more than the company exercising what I regard as its clear right to change its own agents and I would accordingly dissent.

A persuasive argument can be advanced that that is all that is involved. As the Board points out in its Decision and Order, the insurance plan provides that claims will be paid in the amount of the "usual and customary" fee for any particular claim item. Any claim in excess of the usual and customary figure will be referred to the joint insurance committee for resolution. For both administrator/processors the usual

and customary figures are computed on a regular basis, and arrived at in a manner that insures that they bear a relationship to the fees actually charged by medical practitioners. The data from which these figures are generated is derived from the claims actually processed by the administrator. This is not insurance company money that is being paid out but is Keystone's money and the administrator is nothing more than its title indicates. It is the channel through which the "usual and customary" fee is determined.

The cases in which the Board has found the identity of an administrator of a benefit plan to be the mandatory subject of bargaining have involved insurance *carriers*. *Wisconsin Southern Gas Co.*, 173 NLRB No. 79 (1968); *Bastian-Blessing Div.*, 194 NLRB No. 95 (1971), supplemental decision, 195 NLRB No. 167 (1972), enf'd, 474 F.2d 49 (6th Cir. 1973); and *Conn. Light & Power Co.*, 196 NLRB No. 149 (1972), enf. denied, 476 F.2d 1079 (2d Cir. 1973). Even though the third of the above cases, *Conn. Light & Power Co.*, involved an insurance carrier the Second Circuit refused to enforce the Board's decision holding that the identity of an insurance carrier was a permissive not a mandatory subject of bargaining.

It is not clear to me from the record in the present case, however, whether the distinction that the Second Circuit made involves the only issue here. If the bargaining were solely as to the identity of the administrator, and the union did not bargain as to the actual benefits to be received under the insurance plan, admittedly a subject of mandatory bargaining, then it seems to me that this court should deny enforcement, or at the very least remand for a determination as to whether the real issue in negotiations was the identity of the administrator or whether it was the broader issue that the change in administrator affected the substantive terms of the benefit plan, such as how much reimbursement the employees would receive for a given treatment, as well as the promptness with which claims are processed, and the ease with which employees can file claims and obtain information on them.

The General Counsel argues that the change in administrators did result in a sufficient modification of the terms of the 1975 contract on the substantive matters. On the basis of the majority's opinion that differing benefits, sometimes less, sometimes more, did result, I cannot strongly disagree with the result reached. I do strongly disagree, however, that the identity per se is a subject for mandatory bargaining. I regard cases such as *Associated General Contractors v. NLRB*, 465 F.2d 327 (7th Cir. 1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 907, 34 L.Ed.2d 689 (1973), as being analogous to the present case. In that case this court held that the union violated § 8(b)(1)(B) by coercing an employer regarding its selection of its representatives for the purpose of resolving jurisdictional disputes. Yet an argument could be made, again in analogy with the present case, that one company representative of its own choosing might be very strict in resolving such disputes and another individual could be very liberal. The same would apply to the employer's representative on certain jointly trusteed funds which was held in *Carpenters, Local 964 (Contractors & Suppliers Assn.)*, 181 NLRB No. 154, supplemental decision, 184 NLRB No. 67 (1970), enf'd, 447 F.2d 643 (2nd Cir. 1971), to be a permissive subject of bargaining.

I think there could be no question, or at least I would so regard it, if the benefits to be paid were identical, as the term "usual and customary" fee would suggest, the mere fact that one administrator might process claims more promptly or less so than another administrator would have no more bearing on the company's right to select its own representative than would the fact that one supervisor might process and decide grievances more promptly or differently than another would.

I am impressed also in the present case by the following: there is no contractual restriction on Keystone's right to change administrators; Keystone had taken the position in 1975 that the union had no control over Keystone's selection of its administra-

tor; Keystone did bargain with the union to impasse before changing administrators; there was no anti-union purpose involved; and the change was made for a legitimate business purpose—to save money. *See University of Chicago v. NLRB*, 514 F.2d 942 (7th Cir. 1975).

Unfortunately, this litigation also reflects the rather bizarre result that sometimes follows from intransigence during contract bargaining sessions. It seems quite apparent that the employees on the whole are provided with a better coverage plan under the change than was true under the predecessor administrator. This unfortunately, however, does not seem to be the way the game is played.

Notwithstanding all of these aspects of the case, I am ultimately, albeit somewhat reluctantly, persuaded by the thorough analysis of the majority opinion, and by the fact that it does curtail the overly-broad remedial order of the Board, that the unilateral change of the administrator did result in impact on terms and conditions of employment by the changes of benefits and therefore was the subject of mandatory bargaining. In reaching this result I am not relying upon the fact that there might be reasonable differences of a minor nature as to the amounts of "usual and customary fee" but rather on the fact that the record seems to show that there were substantial monetary scheduled differences between the amounts paid by Blue Cross and that paid by Metropolitan. I can only assume that the record does show that this was the basis on which the union continued to bargain to an impasse and adhered to the position that the administrator should not be changed. I would nevertheless have preferred to have remanded that issue to determine whether the union indeed was concerned about these various changes of benefits or was only attempting to prohibit the company from selecting its own representative for reasons never articulated.

In sum, I concur in the result reached in this case.